National Acceptance Company of America, a Corporation, Plaintiff-Appellee, v. The Exchange National Bank of Chicago, as Trustee Under Trust No. 15795, the Hardwood Door Corporation, Sol Auerbach, Fred C. Wright, Pet Wright, National Can Corporation, J. S. Bathalter and Nancy Nosowski, Defendants-Appellants.

Gen. No. 52,483.

First District, Third Division.

October 24, 1968.

Ordower & Ordower, and Robert A. Sprecher and Edward W. Barrett, of Chicago, for appellants.

Archie Schimberg, and Sidney C. Kleinman, of Chicago, for appellee.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

This action was commenced by the National Acceptance Company of America (National) to foreclose two trust deeds, each securing the same parcel of realty, which had been executed by the Hardwood Door Corporation (Hardwood). Hardwood, the principal defendant, contested the action and asserted in its answer that its indebtedness to National had been paid or released; it also counterclaimed, praying that the deeds be cancelled and the recorded liens removed as a cloud upon the title of the property. The cause was referred to a master who found the equities in National's favor and recommended that a decree of foreclosure be entered. The chancellor adopted the master's findings, held Hardwood to be indebted in the sum of $95,731.91 and ordered a foreclosure sale to satisfy the indebtedness. The defendants appeal from this decree.

National is engaged in the business of commercial financing. In February 1961, it agreed to finance Hardwood on a day-to-day basis for an indefinite period and received a bulk assignment of Hardwood's accounts receivable as security. Under this arrangement National agreed to advance Hardwood a sum not in excess of 80% of these accounts. As additional security National was given a lien on Hardwood's entire inventory and it re-

ceived, from time to time, demand notes executed by Hardwood. Hardwood gave National one such note for $50,000 in June 1961, and another for $1,000 in March 1962. These notes were secured by all of Hardwood's accounts receivable and the two trust deeds on its real property which constitute the subject matter of the present litigation. Both deeds contained a provision securing National for all future advances up to $200,000.

In January of 1963, Chi-Way Millwork Corporation (Chi-Way) purchased Hardwood's assets and assumed its liabilities, including the indebtedness due National which at that time totaled $325,839.28. Of this amount $255,839.28 had arisen from money advanced on Hardwood's accounts receivable while the remainder, $70,000, was evidenced by its notes. The total indebtedness was secured by accounts receivable of $381,871.10, inventory of $339,180.01 and the two trust deeds.

Early in January 1963, Ashley Wright, the president of Hardwood, met with Nathan Paset, National's president, and informed the latter of Chi-Way's impending acquisition. He also inquired into the possibility of Chi-Way continuing with the financial arrangement then in existence between Hardwood and National. Paset told Wright that the Chi-Way acquisition and the continuation of similar financing arrangement with Chi-Way were amenable to him, but stated that Hardwood would have to stand behind Chi-Way. Paset desired a guaranty and also requested another trust deed as further protection. The guaranty was executed but the proposed trust deed was not. Although the guaranty contained a statement that it was secured by a trust deed of even date, Wright declined to execute the deed because he was of the opinion that National already had sufficient security. By the terms of the instrument signed by Wright, Hardwood guaranteed any and all indebtedness, not in excess of $200,000, which Chi-Way would thereafter owe National.

The same day that Wright executed Hardwood's guaranty, National and Chi-Way entered into a financial agreement similar to the one previously existing between National and Hardwood. This arrangement continued until March of 1965 when Chi-Way was placed in involuntary bankruptcy. The present action followed when National was unable to recover the entire amount owed in the subsequent liquidation proceedings. Of the $95,-731.91 found due by the master, slightly less than half ($47,643.05) represents Chi-Way's own indebtedness to National and the balance is attributable to unpaid Hardwood notes ($40,000) and accrued interest thereon ($8,-088.86).

Hardwood's position is that it is not liable for Chi-Way's indebtedness and that its notes were paid in full.

We will first consider the notes. Hardwood admits that on May 8, 1963, there was an unpaid balance of $70,000 in its notes payable account but asserts that the indebtedness was subsequently paid in full. According to National's books, the May 8th balance was reduced by $30,000 between that date and December 1963; no further reduction is noted therein and the $40,000 balance remains unpaid. No entry appears in this account from December of 1963 until 1966, when interest was charged. This latter entry was made after the present litigation was under way. The account bears the handwritten notation "Account expired See Chi-Way Millwork," but there is no indication, and there was no testimony, as to when this was added or who was responsible for doing it. Hardwood argues that the notation is significant because certain accounts receivable payments made by Chi-Way after May 8th should have been credited to Hardwood, and these more than made up for the unpaid balance in its notes payable account.

From the date of its acquisition of Hardwood, Chi-Way sent daily reports to National concerning the status of both its own and Hardwood's accounts receivable. By

May 8, 1963, the Hardwood account had been reduced to $54,231.90. On or about this date, Chi-Way borrowed $250,000 from National. National deducted $54,231.90 from the loan and credited it to Hardwood's account before remitting the balance to Chi-Way. Hardwood's account was thus closed out on National's books. Thereafter Chi-Way submitted the receivable reports under its own name, irrespective of further collections that may have been made from Hardwood's outstanding debtors. National credited the payments to Chi-Way's account. There are no entries in this account which in any way substantiate Hardwood's claim that some of these payments were or should have been made in its behalf and, since its accounts receivable indebtedness had been cancelled, should have applied on its notes payable balance.

 Payment is an affirmative defense which must be pleaded by the party maintaining it (Economy Truck Sales & Service, Inc. v. Granger, 61 Ill App2d 111, 209 NE2d 1 (1965)) and proven by a preponderance of the evidence. Hish v. Shelby County, 317 Ill App 540, 47 NE2d 107 (1943). Without going into detail, we may state that we have subjected the record to careful examination and have inspected each exhibit and find proof of payment of Hardwood's notes payable indebtedness (other than the $30,000 previously mentioned) completely lacking. The master's finding and the court's decree that a balance of $40,000 is due on Hardwood's notes is fully in accord with the evidence.

Hardwood next maintains that it is not liable for Chi-Way's debts because the guaranty became inoperative on May 8, 1963, by reason of National's own action in closing Hardwood's receivable account. In support of this position it cites the conversation between Paset and Wright prior to the execution of the guaranty where, allegedly, it was understood that Hardwood would remain a guarantor only until such time as Chi-Way could attain a certain degree of financial stability on its own. Hard-

wood argues that by closing the account National openly signified that it considered Chi-Way to have achieved the requisite financial status and the guaranty was therefore terminated; that Hardwood cannot be held accountable for funds advanced to Chi-Way after May 8th, and that all sums advanced prior to that day have been repaid.

■ Closing Hardwood's account was done at Chi-Way's direction and was a convenience to both Chi-Way and National. The secretary of Hardwood held the same position with Chi-Way after the takeover. One of his responsibilities was the preparation of the daily reports concerning the accounts receivable. He testified that closing the account was merely a clerical matter. The arrangement was accomplished by National drawing a check for $54,231.90 payable to itself, crediting this to Hardwood, debiting it to Chi-Way and deducting it from Chi-Way's $250,000 loan. This bookkeeping transaction cannot be elevated to a release of Hardwood's obligation as a guarantor.

■ Where a contract of guaranty is unequivocal in its terms it must be interpreted according to the language used, for it is presumed that the parties meant what their language clearly imports. It is not what one of the parties may have intended, but what is shown by the contract to have been the intention of both parties. Peoria Savings, Loan & Trust Co. v. Elder, 165 Ill 55, 45 NE 1083 (1897) ; Castle v. Powell, 261 Ill App 132 (1931).

Although not limited to specific duration, the guaranty contained the following language describing the manner by which it could be terminated:

> "It . . . shall continue in full force and effect until notice of termination is given and received by registered mail, and all of said indebtedness, liabilities or obligations created or assumed are fully paid, performed and discharged."

402

In spite of the above provisions, Hardwood would have the instrument construed to have expired at a time when its obligations were not fully paid—when admittedly it still owed thousands of dollars on its demand notes. If there was an understanding that the guaranty would expire when Chi-Way reached a definite financial plateau, it would have been simple for a provision to that effect to have been inserted in the contract. While it may have been impossible to have forecast an exact date when Chi-Way would reach a satisfactory financial position, this does not explain the failure to insert a clause referring to the attainment of this position as the expiration date.

The provisions of the guaranty pertaining to the proper method of termination are clear and all-inclusive. Since Hardwood did not comply with these provisions the guaranty must be deemed to have remained in operation.

This brings us to what seems to be the principal issue between the parties: whether the guaranty is secured by the trust deeds. Hardwood contends that if it is obligated for Chi-Way's indebtedness, National must enforce the obligation in an action at law—that it cannot do so through a foreclosure proceeding.

There are two reasons why the indebtedness arising under the guaranty must be held secured by the trust deeds. First, the language of the deeds indicates an intention that their coverage extend to indebtedness such as contemplated by the guaranty. The applicable provision of the deeds is as follows:

> "WHEREAS, Mortgagor has executed, acknowledged and delivered this trust deed to secure, in addition to the note described above, any and all sums, indebtedness, and liabilities of any and every kind now or hereafter owing or to become due from Mortgagor to holders of the Note, however created, incurred, evidenced, acquired, or arising, whether under the note or this trust deed or any other instru-

ments, obligations, contracts or agreements of every kind now or hereafter existing or entered into by and between Mortgagor and holders of the Note or otherwise, and whether direct, indirect, primary, secondary, fixed or contingent, together with interest thereon as provided in said instruments, and any and all renewals and extensions of any of the foregoing, all of which said sums, indebtedness and liabilities are hereinafter referred to as 'future advances' and all of which 'future advances', as aforesaid together with any such instruments, are hereby expressly secured by this trust deed. . . ."

██ ██ A trust deed in the nature of a mortgage is subject to the same rules as a mortgage. Ill Rev Stats 1961, c 30, § 105. A mortgage may be given to secure future advances and not be void for indefiniteness. Freutel v. Schmitz, 299 Ill 320, 132 NE 534 (1921); Davidson v. Iwanowski, 341 Ill App 152, 93 NE2d 139 (1950). Furthermore, a mortgage can be given to guarantee the debt of another. Riddle v. La Salle Nat. Bank, 34 Ill App2d 116, 180 NE2d 719 (1962).

██ ██ Whether the security of a mortgage extends to the secondary liabilities of a mortgagor is a question of intention to be ascertained from the wording of the instrument. 172 ALR 1096. All-encompassing provisions similar to those contained in the trust deeds have been labeled "dragnet clauses" (see e. g., First v. Byrne, 238 Iowa 712, 28 NW2d 509 (1947)) and "anaconda mortgages" (e. g., Berger v. Fuller, 180 Ark 372, 21 SW2d 419 (1929)) because by their broad terms the unsuspecting debtor is enwrapped in the folds of secured indebtedness. They are to be carefully scrutinized and strictly construed. United States v. American Nat. Bank of Jacksonville, 255 F2d 504 (5th Cir 1958).

 Even when subjected to a strict construction, the unambiguous language of the trust deeds can be interpreted in no other manner than as securing the

404

indebtedness arising under the corporate guaranty. Their wording secures all future indebtedness of Hardwood to National, however created—and whether of a direct, indirect, primary or secondary nature. The intention of the contracting parties could not be evidenced by more certain terms. Although the deeds employ perhaps the broadest possible terminology in describing what debts fall under the umbrella of security, it must be remembered that Hardwood was under no obligation to enter into agreements containing such sweeping language. The sympathy one might entertain for the mortgagor should be tempered by remembering that contracting parties enjoy the freedom to employ in the marketplace whatever they may possess of wisdom or folly (Nardi, Pain & Podolsky v. Vignola Furniture Co., 80 Ill App2d 220, 224 NE2d 649 (1967)) and that a court is without power to alter the clear terms of a mortgage contract. Illinois Joint Stock Land Bank of Monticello v. Leas, 273 Ill App 34 (1933).

There is yet another reason—not mentioned in the briefs of either party, but a conclusive one—why the trust deeds must be held to cover the guaranty. The guaranty itself declares that it is secured by one of the deeds upon which the foreclosure proceeding is based— the instrument of March 1962:

> "To secure the performance of this guaranty . . . the undersigned . . . do hereby . . . pledge . . . the following . . . :
>
> " . . .
> " . . .
> " . . .
>
> "Trust Deed dated March 22, 1962 made by the undersigned in favor of National Acceptance Company of America."

Hardwood is liable for Chi-Way's indebtedness as well as its own; the future advances provision in the trust

405

deeds included the indebtedness arising through the guaranty; the guaranty was neither terminated nor released and the indebtedness was neither paid nor extinguished. The decree is affirmed.

Affirmed.

SCHWARTZ and SULLIVAN, JJ., concur.