**In re OCTAGON ROOFING d/b/a Western Modified Roofing, an Illinois Limited Partnership, Debtor.**

**Bankruptcy No. 90 B 8656.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Jan. 3, 1991.

Donald E. Johnson, Hollis and Johnson, Chicago, Ill., trustee.

Michael Gesas, Gesas, Pilati & Gesas, Chicago, Ill., for debtor.

Bruce Dopke, Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., for NBD Park Ridge Bank.

Frank O'Leary, Baker and McKenzie, Chicago, Ill., for Polyglass, S.p.A.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION TO AUTHORIZE SALE OF ASSETS

JACK B. SCHMETTERER, Bankruptcy Judge.

This cause came on to be heard upon Motion for Leave to Sell Estate Assets Free and Clear of Liens pursuant to 11 U.S.C. § 363(b) and (f) ("the Motion"), filed by Donald E. Johnson ("Trustee"), trustee in bankruptcy of the estate of Octagon Roofing ("Debtor"). Objection to that Motion was filed by the NBD Park Ridge Bank ("Bank"). Due notice was given to all parties in interest. The instant motion was set for evidentiary hearing to determine whether the Trustee could sustain his burden under 11 U.S.C. § 363(f)(3) or (f)(4) so as to allow sale over the Bank's objections. The Court has considered the record in this case, exhibits of the Trustee and Bank entered into evidence, the testimony of witnesses, the pleadings and memoranda filed, and the evidence admitted and statements of counsel made during the evidentiary hearing on the Motion. All parties noticed were afforded an opportunity for hearing on the Motion as is appropriate under the circumstances. Being fully advised in the premises, the Court now makes and enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. On June 21, 1990, Octagon Roofing, an Illinois Limited Partnership ("Debtor"), consented to an Order for Relief under Chapter 7 of the Bankruptcy Code, Title 11 U.S.C.

2. Donald E. Johnson was appointed Chapter 7 Bankruptcy Trustee of the Debtor on July 9, 1990, by the office of the U.S. Trustee.

3. On October 9, 1990 the Trustee sought leave of this Court to sell a roofing materials manufacturing facility located at 150 Lyon Drive, Lyon County, Fernley, Nevada ("the Realty"), together with the equipment, inventory, supplies and other personal property which were used in connection with the Realty, wherever located. The above-listed property constitutes property of the Debtor's bankruptcy estate within the meaning of 11 U.S.C. § 541 (with the sole exception of a certain Chevrolet pickup truck). All such real and personal property is collectively referred to herein as "the Plant". A legal description of the Realty is attached hereto as Exhibit A.

4. On October 25, 1990, the Bank filed its Objection to the Motion. The Bank

holds an uncontested perfected first lien on the equipment, inventory, supplies and other personal property which the Trustee has proposed to sell.

### The Dispute

5. On November 1, 1990, the Trustee filed a four-count Adversary Complaint against the Bank in this district and division as case number 90 A 0873 ("the Adversary Proceeding"). In the first three Counts of the Adversary Proceeding, the Trustee alleged a dispute as to the validity of a certain guaranty ("the Guaranty") and second mortgage which encompassed the Realty ("the Second Mortgage") which Debtor granted to the Bank on August 25, 1989. The Guaranty concerned the indebtedness of American Roofing Systems, an Illinois limited partnership, to the Bank. The Second Mortgage was allegedly given to secure both the Guaranty, and the Debtor's direct borrowings from the Bank. Count I of the Adversary Complaint rests on a theory of fraudulent conveyance under 11 U.S.C. § 548, and seeks to void both the second mortgage lien and the guaranty. Count II asserts preference theory under § 547(b), but rests on a contention that the Bank was in financial control of the Debtor in August of 1989, and therefore was an insider under law. Count III seeks (under the so-called *Deprizio* theory) to void the second mortgage lien under 11 U.S.C. § 547(b) and § 550. Count IV seeks to sell the property over the Bank's objection pursuant to 11 U.S.C. § 363(f)(3) and § 363(f)(4). The Defendant Bank moved to dismiss all counts of the Adversary Complaint for asserted failure to present causes of action. That motion was briefed. This Court has announced intent to dismiss Count II with leave to amend, and to deny the motion to dismiss the other counts.

### Ownership Relationships and Parties

6. At all times mentioned herein:

(a) Hexagon Management Company ("Hexagon") was a corporation organized under the laws of the State of Delaware.

(b) Hexagon was the sole general partner of the Debtor.

(c) Hexagon owned 62.5% of partnership interests in the Debtor.

(d) The following individuals each owned 12.5% of the stock of Hexagon: Eugene Scott, Mike Alcock, Ned Kimbral, Bud Jansen and Rick Rosenow.

(e) Eugene Scott was President of Hexagon.

(f) American Roofing Systems ("ARS") was an Illinois Limited Partnership.

(g) The general partner of ARS was ARC Management.

(h) Ned Kimbral owned 100% of the stock of ARC Management.

(i) The following individuals each owned 16% of ARS, either directly or through wholly owned Subchapter "S" corporations: Eugene Scott, Mike Alcock, Bud Jansen and Rick Rosenow.

(j) NBD Park Ridge Bank ("Bank") was a banking corporation organized and doing business in the State of Illinois.

### The Second Mortgage and Guaranty

7. On August 1, 1989, the Debtor owned real estate located at 150 Lyon Drive in Fernley, Nevada, consisting of a building and ten acres of land ("the Realty").

8. On August 1, 1989, the Realty was then subject only to a recorded first mortgage interest in the approximate amount of $525,000 in favor of WMR Partners.

9. At the end of August, 1989, ARS owed the Bank an amount exceeding $4,000,000.

10. At the end of August, 1989, the Debtor owed ARS approximately $78,-206.74.

11. In August, 1989, Eugene Scott, as President of Hexagon, and on its behalf as general partner of Debtor, executed a second real estate mortgage on said Debtor's real estate in Fernley, Nevada, in favor of the Bank (the "Second Mortgage").

12. The purpose of the Second Mortgage, as stated on the first page of the mortgage document, was to secure a guaranty of $1,000,000 of that portion of ARS'

debt to the Bank exceeding $4,000,000, plus interest and attorneys' fees.

13. In August, 1989, Eugene Scott as President of the general partner of the Debtor (Hexagon) executed the aforesaid guaranty of ARS' debt to the Bank.

14. The Bank's Second Mortgage was recorded on or about August 31, 1989.

15. As of December 31, 1989, there is evidence that the Debtor's liabilities exceeded the value of its assets.

16. As of August 31, 1989, there is evidence that the Debtor's liabilities exceeded the value of its assets.

17. On August 31, 1989, the Debtor owed the Bank at least $2,000,000 for loans made by the Bank to Debtor in 1988.

18. The Debtor did not receive any new funds from the Bank as a result of the Second Mortgage.

19. The Debtor was unable to find alternative financing of its obligations to the Bank in 1989.

20. The Bank would have effectively shut down the operations of ARS had the Debtor not executed Second Mortgage and guaranty.

21. The Bank would have effectively shut down the operations of the Debtor had the Debtor not executed the Second Mortgage and guaranty.

22. The Bank's counsel drafted the Second Mortgage.

23. The Bank, not the Debtor, first suggested that Debtor give the Second Mortgage on its real estate to secure a new guaranty of ARS loans from the same Bank.

24. Based on evidence heard and facts found herein by the Court, there is a bona fide dispute between Trustee and the Bank regarding the validity of Bank's claim of a Second Mortgage security interest in the Realty, and regarding its claim based on the guaranty.

*Trustee's Efforts to Sell the Plant*

25. Debtor was a manufacturer of roofing membranes for commercial and industrial buildings.

26. There have been between fifteen and twenty companies in the United States active as manufacturers in said industry for the period from 1989 to the present. A larger number of similar manufacturers are located in Europe.

27. In the first half of 1989, and subsequently, the Debtor made repeated efforts to sell the Plant.

28. In or about June of 1989, the Debtor hired a Mr. Halperin to sell the Plant.

29. The Debtor was not able to sell the Plant or any assets included therein despite several months of efforts by Mr. Halperin.

30. In August of 1990, the Trustee gathered lists of companies engaged within the United States in manufacture of commercial and industrial roofing materials.

31. At the beginning of September, 1990, the Trustee solicited those companies for bids on the Plant.

32. The Bank's counsel, among other interested parties, were notified of the solicitation efforts of the Trustee in early September, 1990.

33. On September 21, 1990, Trustee traveled to Fernley, Nevada to show the Plant to prospective purchasers and to inspect the premises.

34. By September 27, 1990, Trustee received three sealed bids for the Plant, broken down by the bidders into three parts: a portion to be assigned to real estate; a portion to be assigned to the equipment; and a portion to be assigned to the inventory.

35. On September 28, 1990, Trustee opened those three bids, and informed the Bank's counsel of the results.

36. The bids opened on September 28, 1990, were as follows:

(a) Polyglass, S.p.A. bid a total amount of $1,920,000, assigning $1,350,000 to real estate, $550,000 for the equipment, and $20,000 for the inventory;

(b) Bruce F. Shealey, as Agent for an unidentified party bid the total amount of $1,127,000, assigning $700,000 to real

estate, $360,000 to equipment, and $67,000 to the inventory;

(c) GS Roofing Products, Inc. bid the total amount of $650,000, assigning $140,000 to the real estate, $500,000 to the equipment, and $10,000 to the inventory.

Each said bid was conditioned on a total package sale; no bidder offered to purchase the separate components at the values assigned or at any other price.

37. Trustee also published said assets for sale in the Wall Street Journal, and received several requests for information as a result of that Wall Street Journal advertisement, but no bids.

38. The Trustee's efforts through his Motion to sell Debtor's assets were fair and reasonable under the circumstances. The Trustee provided sufficient notice to all parties-in-interest of the proposed sale to Polyglass, and made reasonable efforts to market and sell the properties that he seeks to sell.

### Valuation of the Assets

39. The land owned by the Debtor in Fernley, Nevada was purchased on or about March 16, 1988, for approximately $101,000.

40. The Debtor's building in Fernley, Nevada was built for a cost of about approximately $1,438,000. The Debtor's equipment installed there was purchased for between $2,000,000 and $2,100,000, and installed for a total cost of about $280,000 for all related shipping, damage, and installation costs. Miscellaneous laboratory equipment, scales, forklifts, and other equipment cost Debtor between $30,000 and $40,000.

41. Based on the foregoing bids and related evidence, and on all the expert and other evidence received by the Court, on June 21, 1990, the fair market value of Debtor's real estate is found to have been approximately $1,350,000; on June 21, 1990, the fair market value of Debtor's equipment was approximately $550,000; and on June 21, 1990 the fair market value of Debtor's inventory was approximately $67,000.

42. The Debtor was operating at five to ten percent of capacity from August 31, 1989, until the Bank shut down the Debtor in mid November of 1989. The Debtor has not operated since November of 1989.

43. Based on all the evidence, the fair market value of Debtor's assets at the Plant as of June 21, 1990, was approximately the same as the value of those assets on August 31, 1989.

### The Bank's Claim

44. On the date its involuntary Chapter 7 case was filed (May 10, 1990), Debtor owed the Bank (subject to its disputes with Trustee) $3,648,519.23 computed as follows:

| Term loan | $1,950,000.00 | principal |
| | 128,970.84 | interest through 5/10/90 ($568.75 per diem after that date) |
| Sub total: | $2,078,970.84 | |
| Revolving loan | $ 339,169.24 | principal |
| | 19,498.59 | interest through 5/10/90 ($98.92 per diem after that date) |
| Sub total: | $ 358,667.83 | |
| Sub total of Direct loans: | **$2,437,638.67** | |
| Guaranty of Liability | $1,000,000.00 | principal |
| | 210,880.56 | interest through 5/10/90 ($1,056.23 per diem after that date) |
| Sub total: | $1,210,880.56 | |

Total Principal and interest through May 10, 1990:

**$3,648,519.23**

The foregoing sum does not include litigation costs and attorney fees incurred by the Bank in connection with this cause, and the Court offers no opinion or findings as to whether such costs may be added to the Bank's claim under §§ 503 or 506(b) of the Bankruptcy Code.

### The WMR First Mortgage Claim

45. The Court, by separate order entered in this case, has determined the value of the claim of WMR Partners, an Illinois General Partnership ("WMR"), that owns an asserted first mortgage in and to the Realty, an interest that is not disputed by Trustee, Debtor, or the Bank. That was done in response to a motion by WMR and based on evidence taken in that matter and Findings and Conclusions separately entered. On November 29, 1990, WMR held a secured claim against this estate in the amount of $613,991.90, plus interest thereafter of $165.41 per diem. Said claim does not include the costs and litigation fees of WMR incurred to date, which WMR has expressly waived. WMR's claim against the Realty is senior to the Bank's claim under its Second Mortgage.

### The Bids

46. Having found that the Trustee's efforts to market the Plant were reasonable and adequate, that the amount of the Polyglass offer was well within the range of value of the Plan properties, and that the Trustee had established a bona fide dispute with the objecting Bank, the Bank's objection to the instant Motion to sell was overruled in open court. On November 29, 1990, the Court authorized Trustee to entertain bids for the Plant. To protect the Trustee's asserted interest in the proceeds of the Realty should he prevail in the Adversary case, the Court ordered (as a condition of permitting the Bank to make a credit bid at the sale pursuant to 11 U.S.C. § 363(k)) that the Bank deliver an irrevocable letter of credit to Trustee, to secure that portion of the Bank's credit bid which is derived from the Bank's asserted Second Mortgage. Following the imposition of this requirement, and expressly subject thereto, the Bank made the following fair and reasonable bid in good faith to purchase the Plant ("the Bid"):

(a) The assets which comprise the Plan would be purchased by the Bank, free and clear of liens, claims and encumbrances thereon, with the sole exception of general taxes due to the County of Lyon, Nevada or to the State of Nevada, which arise from the Debtor's ownership of the Realty (estimated at about $31,000), and the sale would otherwise be conducted in accordance with the terms and conditions set forth in the Motion, except as modified below.

(b) The bank would purchase the Plant for $2,220,000.00 payable:

(i) in cash, paid directly to WMR, in an amount sufficient to satisfy WMR's secured claim against the estate (including per diem interest but excluding litigation costs), within fourteen days of the date of entry of the Order approving sale, which payment shall constitute a partial payment toward the Bank's purchase of the Realty.

(ii) a credit bid in the amount of $416,008.90, made pursuant to § 363(k) of the Bankruptcy Code, which credit bid would be derived from the Bank's Mortgage lien against the Realty, and would be applied, with the payment to WMR (i.e., $613,991.90, plus $165.41 per diem interest from and after November 30, 1990), in full payment of the Bank's purchase of the Realty;

(iii) a credit bid in the amount of $1,190,000.00, made pursuant to § 363(k) of the Bankruptcy Code, which credit bid would be derived from the Bank's uncontested lien on the personal property contained within and about the Plan and would be applied in full payment of the Bank's purchase of that personal property; and

(c) The Bid was made with an express representation that the Bid did not constitute an express or implied consent, by the Bank, to the taxation against the Bank or its collateral of any administrative expense of this estate arising from the sale or otherwise. Further, the right of the Bank to credit bid was allowed without prejudice to the Trustee's disputes and subject to the possibility that the Bank may be required to pay more cash should Trustee prevail in his suit and the Bank's right to credit bid is shown to have been diminished.

47. The highest bid of Polyglass, S.p.A. for the Debtor's assets, included in said Motion, was a cash bid of $2,120,000. That bid is also a fair and reasonable bid made in good faith, although lower in amount than that of the Bank.

48. The Bank made the highest and therefore the successful Bid (subject to the requirement of posting the letter of credit referred to in paragraph 46 above), to protect that portion of its secured claim which arises from its uncontested lien against the Debtor's personal property, as well as that portion of its alleged secured claim which arises from its disputed Second Mortgage, in light of the Trustee's Motion and the Court's overruling of the Bank's objections thereto.

49. The Trustee recommended that the Court accept the Bank's Bid at the conclusion of the hearing which ended on November 29, 1990, and that the Court close the bidding. The Court thereupon accepted the Bank's Bid and closed the bidding. There was then found to be no reason why the Bank's Bid should not then be accepted by the Court and implemented without further delay.

50. From the evidence and using the approximate proportion of values found in ¶ 40 hereof for the different properties, the Court values $1,061,000 of the Bank's bid for the Estate's assets to be for the value of the real estate portion of those assets, resulting in a net value figure of $1,030,000 for real estate after subtracting $31,000 for assumption of real estate taxes by the purchaser.

51. The first mortgage holder for said real estate is WMR Partners which holds an allowed secured claim against the Estate of $613,9911.10, as of November 29, 1990.

52. The difference between the Court's valuation of said real estate and the WMR Partners claim as of November 29, 1990, is $416,008.90.

53. Should the Trustee be successful in his Adversary complaint against the Bank, the Trustee will generate approximately $416,008.90 for the creditors of this Estate by obtaining from the Bank the difference between the value of the real estate being sold and the value of the first mortgage to WMR Partners. To the extent, if any, that the Trustee succeeds, the Bank's right to credit bid will be shown to have been diminished. The amount of $416,008.90 is the amount of letter of credit required as discussed in Finding No. 46.

54. Statements of fact set forth in the Conclusions of Law, and statements by the Court from the bench at the conclusion of trial, shall stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

1. Pursuant to 28 U.S.C. § 157(b)(2)(N) and (O) this matter is a core proceeding as it involves the sale of Estate property. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 363.

2. The Bank's allowed secured claim, if its second real estate mortgage claim were to be avoided, would be substantially reduced pursuant to the bifurcation of claims required by 11 U.S.C. § 506(a). *See In re Oneida Lake Development, Inc.*, 114 B.R. 352, 356 (Bankr.N.D.N.Y.1990).

3. If Trustee prevails in his Adversary case, the original bid by Polyglass, S.p.A., of $1,920,000, will exceed both the Bank's secured claim and the first mortgage lien of WMR Partners. That bid would then exceed the aggregate value of liens against the property, and the Trustee would then be enabled to sell said assets to Polyglass free and clear of liens and over the Bank's

**590**

objection, under 11 U.S.C. § 363(f)(3). 11 U.S.C. § 363(f)(3); *See Oneida,* 114 B.R. at 356–57 (in which the court authorized sale of assets free and clear of liens since the proposed sale price was greater than the aggregate value of all liens on property). However, there cannot be a sale under § 363(f)(3) at this time over the objections of the Bank because the Trustee has thus far only alleged what is found to be a bona fide dispute, but has not yet been found to have proved his case.

■ 4. The Adversary Complaint filed by Trustee against the Bank herein pleads a dispute between the Trustee and the Bank as to the Bank's claim of a guaranty by the Debtor of ARS' debts to the Bank, and the Bank's assertion of its Second Mortgage security interest against Debtor's real estate. Based on evidence presented, such dispute is bona fide in Counts I and III thereof. . The Bank's assertion of its second mortgage security interest may ultimately prove to be voidable as a preference or a fraudulent conveyance. In this regard Trustee has presented a bona fide dispute under 11 U.S.C. § 363(f)(4), thus allowing a sale to go forward on Trustee's motion over the Bank's objection.

■ 5. The term "bona fide dispute" is not defined in § 363(f)(4) of the Code. However, the term "bona fide dispute" is also used in the Bankruptcy Code at 11 U.S.C. § 303 in connection with the nature of claims asserted as basis for an involuntary Chapter 7 petition. To determine in this Circuit what constitutes a bona fide dispute, "the bankruptcy court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of debt." *In re Busick,* 831 F.2d 745, 750 (7th Cir.1987). Under this standard, a court need not determine the probable outcome of the dispute, but merely whether one exists. Id. No authority has been cited showing that "bona fide dispute" has any different meaning when used in 11 U.S.C. § 363(f)(4), and the parties each agreed before this Court that the foregoing standard applies here. That standard has been met by the evidence presented. This Court rejects cases from other jurisdictions cited by Trustee that implied or found that merely alleging a dispute is enough to meet the burden under 11 U.S.C. § 363(f)(4). The standard in *Busick* requires, at least in this Circuit, some factual grounds to show that there is "an objective basis" for the dispute. In the context presented here, that standard requires evidence, and such evidence was presented.

6. There is a bona fide dispute presented in Count III of Trustees Complaint:

(a) Count III of Trustee's adversary proceeding herein relies on the recent case of *Levit v. Ingersoll Rand Financial Corp.,* 874 F.2d 1186 (7th Cir.1989). In the *Levit* case involving the Deprizio Construction Company (hereinafter *Deprizio* ), the one year insider preference time period arising out of § 547(b)(4)(B) of the Code was applied to an initial transferee under § 550(a)(1). The Bank, in the instant case, may be an initial transferee in that it received a guaranty of ARS' obligations to the Bank from the Debtor in August, 1989, and a second mortgage on the Debtor's real estate, recorded on or about August 31, 1989. Pursuant to *Deprizio,* when a benefit goes to an inside creditor of a Debtor, the initial transferee can be liable for a preferential transfer up to one year before filing of the bankruptcy case. ARS was a creditor of the Debtor in August, 1989, and ARS was an insider of the Debtor. Benefit to ARS is shown on the first page of the second mortgage document in which the Debtor acknowledges its new guaranty of ARS' obligation of over $4,000,000 to the Bank supported by a second mortgage against the Debtor's real estate. Moreover, the Bank would have shut down ARS if it did not receive the second mortgage on Debtor's real estate in August, 1989. Accordingly, ARS appears to have received a substantial benefit.

(b) There is also a bona fide dispute over the remaining elements required to find a preference under 11 U.S.C. § 547. On August 31, 1989, the Bank was a creditor of the Debtor, in an amount over $2,000,000, from a 1988 loan. The Bank asserts that

the purpose of the Second Mortgage was to secure the antecedent debt of Debtor to the Bank. Evidence indicates that the value of Debtor's assets may have been less than its liabilities on August 31, 1989, and there is a bona fide dispute as to insolvency of the Debtor at that time. Also, as an undersecured creditor, the Bank stood to receive substantially more through its asserted Second Mortgage security interest than it would have received had the Second Mortgage and guaranty not been given.

■ 7. Count II of the Adversary Complaint will shortly be dismissed for failure to state a cause of action or grounds for relief, but with leave to file an amended complaint. Moreover, the evidence presented at the recent hearing does not support the claim of operating control to the degree necessary under law to establish the Bank as an "insider" under § 547(b). See *Badger Freightways Inc. v. Continental Ill. Nat'l. Bank*, 106 B.R. 971, 979–83 (Bankr.N.D.Ill.1989) (in which the court found that because the debtor had failed to allege facts demonstrating the requisite level of "operating control," the debtor had failed to plead that a lender was an "insider" under § 547(b)(4)(B)).

8. There is a bona fide dispute presented in Count I of the Trustee's Complaint:

(a) Count I of the Adversary Complaint herein asserts a fraudulent conveyance under § 548(a)(2) of the Bankruptcy Code. This was asserted by the Trustee in the alternative to the preference count should the Court hold that the purpose of the Second Mortgage was not to secure Debtor's antecedent obligations, but rather was to secure its guaranty of ARS' debt to the Bank. This issue depends on whether or not the "boilerplate" provision on page two of the Bank's second real estate mortgage alters the stated purpose on page one of the mortgage, that of securing debtor's guaranty of ARS' debt of over $4,000,000 to the Bank. The page two provision in question states that the mortgage secured:

> ... all indebtedness of Mortgagor to the Mortgagee, whether now existing or hereafter incurred ...

(b) If that form provision on the second page of the mortgagee (referring to Debtor only as "Mortgagor") is applicable, the Bank may be subject to the preference provisions because the mortgage was given to secure an antecedent debt. If, however, the Court ultimately holds that the real purpose of the Second Mortgage was to secure ARS' debt to the Bank, there is a bona fide dispute as to whether the Bank received a fraudulent conveyance of the guaranty and Second Mortgage because the Debtor did not receive reasonably equivalent value from the Bank in return for giving the mortgage. In fact, Debtor did not receive any new loans from the Bank for this transfer. The Bank argues that Section 548(d)(2)(A) should be applied because the Second Mortgage to secure an antecedent debt was for value. However, Trustee contends that the boilerplate language on page two of the mortgage did not set forth the prime reason for the transfer. In fact, the second page of the mortgage does not refer to any specific debt of the Debtor to the Bank, whereas the first page is very specific regarding the obligation of ARS to the Bank. The mortgage documents were prepared by the Bank's counsel. The initiative for this form of transaction came from the Bank and not the Debtor.

(c) The following Illinois cases show that clauses like that found on page 2 of the mortgage are identified as "dragnet" clauses, and are not favored under Illinois law: *National Acceptance Co. v. Exchange National Bank*, 101 Ill.App.2d 396, 243 N.E.2d 264 (1st Dist.1968) and *Farmers and Mechanics Bank v. Davies*, 97 Ill. App.3d 195, 52 Ill.Dec. 655, 422 N.E.2d 864 (3rd Dist.1981). In addition, the Kansas Supreme Court in *First Natl. Bank & Trust Co. v. Lygrisse*, 231 Kan. 595, 647 P.2d 1268 (1982), ruled that "antecedent debts may be secured by a mortgage containing a dragnet or other advances clause only if the antecedent debts are clearly identified in the mortgage." *Id.* at 599, 647 P.2d 1268. In the instant case there is no specific description of any antecedent debt of the Debtor, but there is a very specific description of the ARS debt to the Bank.

Accordingly, the Kansas Supreme Court would not apply the second page "boilerplate" provision of the Bank's mortgage; whether the Illinois courts would do so remains to be determined.

(d) As the Bank ultimately shut down the Debtor in November, 1989, after the foregoing transfer, the Debtor was left with low capital. In addition, the Debtor was unable to obtain alternative financing and could not keep up payment of its current obligations. *See also In re Osage Crude Oil Purchasing, Inc.,* 103 B.R. 256 (Bankr.N.D.Okl.1989).

■ 9. Trustee has pleaded and the evidence demonstrates bona fide disputes between the Trustee and the Bank as to Counts I and III of his Adversary Complaint. The Trustee's efforts to market and sell the Plant were reasonable and adequate. The original Polyglass bid was within the range of value of the Plant properties. Accordingly, pursuant to 11 U.S.C. § 363(f)(4) the sale to Polyglass or any higher bidder was allowed to proceed as moved by the Trustee, over the Bank's objection. However, the evidence did not present cause to preclude the Bank from making a credit bid of its lien in assets which Trustee proposed to sell pursuant to 11 U.S.C. § 363(k) so long as Trustee was protected (as was ordered separately) by the Bank posting an irrevocable letter of credit drawn on another bank. That letter of credit will guarantee payment of up to $416,008.90 to Trustee should Trustee ultimately prevail in his Adversary Complaint. Therefore, by separate order the Bank was allowed to credit bid its claim under 11 U.S.C. § 363(k). Trustee by separate order was allowed and directed to sell the Plant to the Bank for its high bid of $2,220,000 upon terms set forth therein, and to sell to Polyglass on its highest bid should the sale to the Bank abort.

10. Conclusions of Law contained in the Findings of Fact and the remarks of the Court at the conclusion of the trial, shall stand as additional Conclusions of Law. These Findings and Conclusions are made and entered *nunc pro tunc* November 29, 1990, when the Court ruled from the bench.

**EXHIBIT A**

**Parcel 1:**

All that certain real property situate in Section Seventeen
(17), Township Twenty (20) North, Range Twenty Five (25) East,
M.D.M., Lyon County, Nevada, described as being a portion of
Parcels "B" and "C" of Parcel Map No. 995, as filed under
Document No. 53036, in the Office of the Recorder of said Lyon
County, and being more particularly described as follows:

BEGINNING as a point on the West line of said Parcel "B" from
which the Northwest corner thereof bears North 01°05'00"
East, 680 feet; thence from said POINT OF BEGINNING, South
88°55'00" East, 587.00 feet to the centerline of a 30.00 foot
wide track easement as granted to Southern Pacific
Transportation Company by Deed recorded February 5, 1982 under
Document No. 66128, Records of said Lyon County; thence along
the centerline of said track easement, South 01°05'00" West,
742.08 feet; thence North 88°55'00" West, 587.00 feet; thence
North 01°05'00" East, 742.08 feet to the POINT OF BEGINNING.

**Parcel 2:**

A non-exclusive easement for access and utilities described as
follows:

All that certain real property situate in Section Seventeen
(17), Township Twenty (20) North, Range Twenty-Five (25) East,
M.D.M., Lyon County, Nevada, described as being a portion of
Parcel "C" of Parcel Map No. 955 as filed under Document No.
53036 in the office of the Recorder of said Lyon County, and
being more particularly described as follows:

A strip of land 80.00 feet in width (measured at right angles)
the centerline of which is described as BEGINNING at a point in
the Northerly line of the lands shown on said Parcel Map from
which the Northwest corner of said Section 17 and said Parcel
Map bears North 88°55'00" West, 440.00 feet; thence from said
POINT OF BEGINNING, South 01°05'00" West, 1422.08 feet to the
point of terminus of said centerline.

126929
OFFICIAL RECORDS
LYON COUNTY, NEV.
RECORD REQUESTED BY

*Laura Lipinski*

'89 AUG 31 AM 10 10

NANCY M. CARR
COUNTY RECORDER
FEE /7.55/ DEP /M.