In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 06-1805

UNIVERSAL GUARANTY LIFE INSURANCE COMPANY,

*Plaintiff-Appellee,*

*v.*

WILLIAM N. COUGHLIN,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 3:05-CV-3130—**Richard Mills**, *Judge.*

———————

ARGUED JANUARY 17, 2007—DECIDED MARCH 14, 2007

———————

Before FLAUM, KANNE, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.*   Health Management Limited Partnership ("Health Management") owned a hospital in Springfield, Illinois when it filed for bankruptcy on April 2, 2003. At the time, Health Management owed debts to Marine Bank and National City Bank. This case concerns a March 7, 2003 loan from Marine Bank to Health Management that Dr. William Coughlin secured with $250,000 of his own cash. Coughlin claims that the loan was secured by both his cash and Marine Bank's first priority interest in Health Management's accounts receivable. The bankruptcy court disagreed and held, after a bench trial,

that the loan was not secured by Health Management's accounts receivable. Coughlin appealed, and the district court affirmed. For the following reasons, we reverse.

## I. Background

During the 1990s, Health Management operated Doctors Hospital in Springfield, Illinois. To cover its operating costs, Health Management borrowed money from National City Bank ("National City") in exchange for a first mortgage on Health Management's hospital facility and a first priority lien on its other business assets, including its accounts receivable. Eventually, National City assigned its security interest to Universal Guarantee Life Insurance Company ("Universal"), which assumed National City's position in this litigation.

In 1999, Marine Bank of Springfield ("Marine Bank") extended Health Management a $4 million line of credit. As security, Marine Bank received a second mortgage on the hospital and other Health Management assets, including its accounts receivable. Marine Bank then negotiated with National City to acquire the first priority lien on the accounts receivable.

The most recent version of Marine Bank's security agreement with Health Management became effective on April 30, 2002 and stated that a first priority security interest in Health Management's accounts receivable secured all of Health Management's "obligations." The term "obligations" was defined as follows:

> any and all of the Borrower's Indebtedness and/or liabilities to the Bank of any kind, nature and description, direct or indirect, secured or unsecured, joint, several, joint and several, absolute or contingent, due or to become due, now existing or hereafter arising, regardless of how such indebtedness or liabilities arise

or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument . . . .

This type of contract provision is known as a dragnet clause because it secures current as well as future debt. The April 30, 2002 security agreement also provided that it could not be modified, amended, or terminated "orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the Borrower to be charged." The parties signed security agreements that were consistent with the language of the April 30 security agreement.

Between 1999 and February 2003, Health Management executed a number of promissory notes (the parties do not specify how many) payable to Marine Bank. Each loan agreement stated that Health Management's accounts receivable secured the loan. Additionally, when Health Management submitted each loan to its loan committee, the loan presentation documents recited that its accounts receivable secured the loan.

On January 10, 2003, Health Management was $150,000 overdrawn on its Marine Bank account and had maxed out its revolving line of credit. It convinced Marine Bank to lend it an additional $250,000, but Marine Bank insisted that the loan be secured by the personal guarantees of a number of Health Management's partners and by Health Management's accounts receivable. Marine Bank promised that it would satisfy the debt using Health Management's accounts receivable ahead of the personal guarantees. Eventually, the January 10 note became overdue, and, as promised, Marine Bank used Health Management's accounts receivable to pay the loan.

On March 7, 2003, Health Management sought a second $250,000 note to cover the hospital's payroll. Marine Bank said that it would make the loan if it was collateral-

ized fully by cash. Health Management convinced Dr. William Coughlin, a staff physician and a former limited partner of Doctors Hospital, to provide the requested collateral. Coughlin thought the loan involved little risk because the hospital's accounts receivable amounted to approximately $8 million—two times the value of the hospital's revolving line of credit. The loan documents were signed in a hurry, and Coughlin did not read them. Coughlin signed "an assignment agreement" that allowed Marine Bank to keep Coughlin's $250,000 until Health Management repaid the loan. He also signed a "hypothecation agreement," in which the parties agreed to make a loan secured by the $250,000. None of the documents discussed a security interest in Health Management's accounts receivable.

On April 2 or 3, 2003, Marine Bank discovered that Health Management was depositing receipts in an account at another bank. Marine Bank became concerned about Health Management's continuing viability, so it took possession of Coughlin's $250,000 collateral. On April 2, 2003, Health Management filed for bankruptcy.

Within one or two days of the bankruptcy filing, the bankruptcy court entered an "Order Authorizing Use of Certain Cash Collateral," to which National City, Marine Bank, and Universal stipulated in open court. The order stated that Health Management owed Marine Bank approximately $3,600,000 and that any party had until July 1, 2003 to challenge the amount of this debt. Coughlin maintains that the March 7, 2003 loan was part of the $3.6 million debt discussed in the order. He also notes that Universal did not challenge the amount of debt before July 1.

Doctors Hospital closed within a month of the bankruptcy filing, and Marine Bank collected the hospital's accounts receivable until its debt was paid in full. At that

point, Universal began collecting the remaining accounts, though it recovered only a fraction of the $9 million it was owed. When, in the fall of 2003, Coughlin maintained that he was entitled to $250,000 of the accounts receivable, Universal filed the current adversary proceeding, alleging that Health Management's accounts receivable did not secure Marine Bank's March 7 loan. Coughlin, as the subrogee of Marine Bank under 11 U.S.C. § 509, responded that the bankruptcy court had already ruled that Health Management's accounts receivable secured the loan and that the April 30, 2002 dragnet clause secured all of Health Management's future debts to Marine Bank.

On August 18, 2004, the bankruptcy court presided over a short bench trial. On May 5, 2005, the court ruled in Universal's favor, concluding that the court's Cash Collateral order did not preclude it from considering how the March 7 loan was secured. On the merits, the court held that Health Management's accounts receivable did not secure the March 7 loan.[1] The court said that Marine Bank knew how to create a security interest in accounts receivable and that the March 7 loan did not create such an interest.

---

[1] The bankruptcy court also implied that Coughlin's March 7 assignment agreement with Marine Bank modified the April 30, 2002 security agreement between Marine Bank and Health Management. *See* App. 26. The parties did not brief this issue, but we note that no such modification occurred. The March 7 assignment agreement provided that it "constitute[d] the entire understanding and agreement of the parties," but only as "to matters set forth in the Agreement." The assignment agreement concerned Marine Bank's security interest in Coughlin's deposit account. It did not concern the terms of the underlying loan or any additional security for that loan. Consequently, it did not modify the April 30 security agreement.

The district court affirmed the bankruptcy court. It observed that the March 7 loan, unlike the previous loans between Marine Bank and Health Management did not mention a security interest in accounts receivable. The district court did not address whether the dragnet clause in the April 30, 2002 security agreement covered the March 7 loan.

## II.  Analysis

### A.  Cash Collateral Order

Coughlin first argues that the bankruptcy court's Cash Collateral order barred it from reconsidering whether Health Management's accounts receivable secured the March 7 loan. Coughlin maintains that the ruling has collateral estoppel effect and is the law of the case. The Court reviews the question de novo. *See Adair v. Sherman*, 230 F.3d 890, 893 (7th Cir. 2000) (collateral estoppel); *Moore v. Anderson*, 222 F.3d 280, 283 (7th Cir. 2000) (law of the case).

For a ruling to have collateral estoppel effect, "four elements must be met: '(1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action.'" *Meyer v. Rigdon*, 36 F.3d 1375, 1379 (7th Cir. 1994) (quoting *La Preferida Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 906 (7th Cir. 1990)). Like the collateral estoppel doctrine, law of the case only applies where a court actually decided the issue in question. *See* Wright & Miller, Federal Practice & Procedure § 4478. In this case, neither doctrine applies because the Cash Collateral order did not resolve whether Health Manage-

ment's accounts receivable secured the March 7 loan. Though the order said that Health Management owed approximately $3.6 million to Marine Bank and that Health Management's accounts receivable secured that debt, the order did not state whether the $3.6 million included the $250,000 March 7 loan.

## B.  Security for the March 7 Loan

Coughlin next argues that the dragnet clause in the April 30, 2002 security agreement covered all of Health Management's future debt to Marine Bank, including the March 7 loan. Universal responds that the March 7 loan did not mention a security interest in accounts receivable and, therefore, was secured only by Coughlin's $250,000. The parties agree that Illinois law applies. The issue is one of contract interpretation, which we review de novo. *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801, 821 (Ill. 2005).

A dragnet clause "saves the parties the trouble of executing a new security agreement every time there is a further extension of credit. It also backstops the lender against the possibility of an inadvertent failure by the borrower to execute the new agreement." *In re Kazmierczak*, 24 F.3d 1020, 1021 (7th Cir. 1994) (applying Wisconsin law). Dragnet clauses are not favored in Illinois, but they are enforceable if they are clear and unambiguous. *See* 810 ILCS 5/9-204; *Metro. Life Ins. Co. v. Am. Nat'l Bank & Trust Co.*, 682 N.E.2d 72, 77 (Ill. App. Ct. 1997); *Nat'l. Acceptance Co. of Am. v. Exchange Nat'l Bank of Chi.*, 243 N.E.2d 264, 268 (Ill. App. Ct. 1968).

In *National Acceptance,* the defendant borrowed money from the plaintiff in 1961 and 1962 and secured the debt with, among other things, two trust deeds on its real property. The deeds contained broadly worded dragnet

clauses securing all of the defendant's future debts to the plaintiff up to $200,000. In 1963, the defendant guaranteed a third-party's debt to the plaintiff. The guaranty stated that it was secured by a trust deed executed on the same date, but the parties never actually executed that deed because the defendant believed the guaranty was secured by sufficient collateral. The guaranty did not state, however, that it was secured by the 1961 and 1962 trust deeds. When the third-party filed for bankruptcy, the plaintiff sued the defendant, alleging that the deeds' dragnet clauses secured the guaranty. The court agreed with the plaintiff. It recognized that dragnet clauses are ordinarily construed narrowly, but nevertheless held that the unambiguous language of the trust deeds covered the guaranty. *National Acceptance*, 243 N.E.2d at 268.

In *Metropolitan Life*, Bank One loaned money in 1990 to Woodfield Hotel, which executed a security agreement giving Bank One a security interest in Woodfield's furniture and equipment. The 1990 security agreement contained a dragnet clause. In 1992, Bank One extended Woodfield a new loan agreement that referred to a security agreement in accounts receivable, but the parties never executed that agreement. The loan documents also contained a space to check the type of collateral that secured the loan. Though furniture and equipment was one of the spaces that the parties could have checked, the parties left the space blank. Instead, they checked only accounts receivable. The court held that there was an ambiguity between the 1990 and 1992 agreements and construed the ambiguity against the drafter, Bank One. Alternatively, the court held that the 1992 loan explicitly terminated the 1990 security agreement. The court observed that the 1992 loan said, "[T]his agreement contains the entire agreement of the parties and supersedes all prior agreements and understandings, oral or

written, with respect to the subject matter hereof." *Metro-politan Life*, 682 N.E.2d at 78.

At first glance, it appears difficult to reconcile *National Acceptance* with the first holding in *Metropolitan Life*. In both cases, the parties entered a security agreement that contained a dragnet clause, then entered a subsequent loan agreement that did not mention the first security agreement, yet only *National Acceptance* concluded that the dragnet clause protected the creditor.

The key factual distinction between these cases—putting aside the language in *Metropolitan Life* expressly terminating prior agreements—is that the second loan agreement in *Metropolitan Life*, unlike the guaranty in *National Acceptance*, contained a space that allowed the parties to indicate that the loan was secured by furniture and equipment. The parties left that space blank and checked a different space indicating that the loan was secured by the debtor's accounts receivable. Though it did not say so explicitly, it appears that the court in *Metropolitan Life* viewed the blank space as the equivalent of an affirmative statement that the second loan was not secured by furniture and equipment. This rendered the contract language ambiguous because the two documents gave conflicting answers about whether the debt was secured by furniture and equipment. The 1990 dragnet clause said that the debt was secured by furniture and equipment, but the 1992 loan agreement said that it was not. Contradictory language in a contract is classically ambiguous. *See, e.g.*, *Yates v. Farmers Auto Ins. Ass'n*, 724 N.E.2d 1042, 1045 (Ill. App. Ct. 2000) (holding that contradictory language in a contract is ambiguous); *Chastain v. Chastain*, 500 N.E.2d 998, 1000).

Had the 1992 loan agreement in *Metropolitan Life* said nothing about security and not expressly terminated the prior agreement, we believe the court would have enforced

the dragnet clause. *National Acceptance* holds as much, and to hold otherwise would be to ignore the dragnet clause entirely. *See Kazmierzak*, 24 F.3d at 1024 (noting that courts should avoid rendering a dragnet clause meaningless) (applying Wisconsin law). We assume the court also would have enforced the dragnet clause if the second loan agreement said nothing about a security interest in furniture and equipment (i.e., if it had no blank space for checking furniture and equipment) and only mentioned the security interest in accounts receivable. There is nothing ambiguous or contradictory about two documents, one that secures a loan with collateral A and another that secures the same loan with collateral B. Many loans are secured by multiple forms of collateral. On the other hand, where, as in *Metropolitan Life*, a loan agreement affirmatively states that a loan is secured by collateral A and not secured by collateral A, it makes sense to find the agreement ambiguous.

In this case, the March 7 loan agreement said that the loan was secured by Coughlin's $250,000, but made no mention of a security interest in Health Management's accounts receivable. It also contained no language terminating or modifying the April 30, 2002 security agreement. As a result, there was no contradiction or inconsistency between the various loan and security documents, and the plain and unambiguous language of the dragnet clause controlled.

Universal attempts to avoid this outcome by noting that previous Marine Bank/Health Management loan agreements stated that they were secured by Health Management's accounts receivable, though this loan did not. Therefore, Universal maintains, the parties must not have intended to use that collateral as security. We reject this argument for two reasons. First, the purpose of a dragnet clause is to protect a creditor against the possibility that it might forget to execute a security agreement.

*See Kazmierczak*, 24 F.3d at 1021. Therefore, it makes little sense to penalize a party that negotiated a dragnet clause when that party fails to mention the security interest in a subsequent loan agreement. Second, the dragnet clause in this case stated that it could not be modified "orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the Borrower to be charged." This means that absent an express modification, Marine Bank's other loans with Health Management could have no bearing on the meaning or effect of the April 30, 2002 dragnet clause.[2]

### III.  Conclusion

For the foregoing reasons, we REVERSE the bankruptcy court's ruling.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

---

[2] Universal also points to parol evidence indicating that the parties did not intend the March 7 loan to be secured by accounts receivable (though there is also parol evidence to the contrary). Because the dragnet clause is unambiguous, we cannot consider parol evidence. *See River's Edge Homeowners' Ass'n v. City of Naperville*, 819 N.E.2d 806, 809 (Ill. App. Ct. 2004) ("If the language is unambiguous, then the trial court interprets the agreement without resort to parol evidence.").