In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2252

WEST BEND MUTUAL INSURANCE
COMPANY,

*Plaintiff-Appellant,*

*v.*

PROCACCIO PAINTING & DRYWALL
COMPANY, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 12-CV-06425 — **Harry D. Leinenweber**, *Judge*.

ARGUED DECEMBER 9, 2013 — DECIDED JULY 10, 2015

Before WILLIAMS, SYKES, and HAMILTON, *Circuit Judges*.

SYKES, *Circuit Judge*. This case requires us to explore the arcana of workers' compensation insurance—more specifically, the complex formula used to calculate an employer's annual premium for this coverage.

For many years Procaccio Painting & Drywall Company, Inc., a large Illinois construction contractor, purchased its workers' compensation insurance from West Bend Mutual Insurance Company, a Wisconsin-based insurer. Because Procaccio paid above-average wages, it was entitled to a special premium credit under the Illinois Contracting Classification Premium Adjustment Program. The parties refer to this as the "ICC credit," so we'll use that shorthand too. The amount of the ICC credit was calculated by a third party—the National Council on Compensation Insurance ("National Council")—but typically not until after West Bend renewed Procaccio's annual policy and estimated its new premium based on other rating factors. As a high-wage union contractor with a large work force, Procaccio was entitled to a substantial ICC credit every year.

This litigation concerns three policy years: 2006, 2007, and 2010. West Bend's general practice was to apply the ICC credit via an endorsement to the policy after the National Council determined the amount. During these three years, however, West Bend largely offset the ICC credit by simultaneously reducing a different credit, known as the Schedule Modification credit, which it had temporarily inflated when initially estimating Procaccio's premium at the time the policy was renewed. This manipulation of the two credits—artificially inflating one and later using the other to offset the inflation—was a premium-stabilization measure intended to benefit Procaccio by ensuring that it did not have to pay excessive monthly premiums while waiting for the National Council to calculate the ICC credit. Or so says West Bend.

The problem is that the insurance policy doesn't mention this credit-offset procedure. West Bend claims that Procaccio's president orally blessed the arrangement. Procaccio denies that and raises the parol-evidence rule to block any evidence of an oral "side agreement" to "front" the ICC credit in this way. Procaccio contends that West Bend's offset procedure effectively nullified its ICC credit for these policy years, resulting in substantial overcharges. The district court agreed and awarded a large sum in damages.

We affirm. The insurance policy contained no agreement to adjust the Schedule Modification credit after the ICC credit became due. West Bend needs parol evidence to prove its version of the parties' agreement, but the insurance contract was fully integrated so any evidence of an oral understanding with Procaccio's president is inadmissible. And while West Bend had the unilateral right to issue endorsements, that authority is cabined by contractual and statutory restrictions on its ability to alter its rates. In short, even if the Schedule Modification credit was artificially inflated for these policy years, West Bend was not permitted to reduce it based on Procaccio's ICC credit.

## I. Background

Workers' compensation insurance is premised on retrospective ratings. An employer's premium depends upon (among other things) its actual payroll and the classification of its employees—data that changes during the course of a policy year. Accordingly, the insurer sets the final premium after the

policy lapses, and until then the employer pays a series of estimated premiums. Because of the ongoing need to update the policy, the insurance contract generally gives the insurer the unilateral right to modify the contract by subsequent endorsement. As the facts determining the employer's rating change, the insurer will issue endorsements reflecting the changes.

But the insurer's right to issue endorsements is not unlimited. Illinois heavily regulates how workers' compensation insurers formulate their rates. 215 ILL. COMP. STAT. 5/456. State law mandates that insurance companies file manuals of classifications, rules, and rates within 30 days after they become effective. *Id.* § 5/457. The law requires insurers to apply the "correct classifications, payrolls and other factors of a rating system to compute premiums." *Id.* § 5/462b. If an insurance company incorrectly calculates the premium to the detriment of an insured, the company must refund the overage. *Id.* The insured must receive advance notice if the insurance company attempts to raise rates by more than 30% when renewing a policy. *Id.* § 5/143.17a. Finally, the parties can cabin the premium by contracting for a specific formula and minimum and maximum premiums.

To give an oversimplified example of how this system works in practice, suppose a car wash has two types of employees: those who operate the car washing machines and the salespersons behind the cash register. The car wash may pay a rate of $2 for every $1,000 of payroll for those who operate the machines and $1 for every $1,000 of payroll for the

salespersons. This specific rate—$2 for machine operators and $1 for salespersons—is fixed *ex ante* pursuant to the insurance company's filed rate plan. But the actual premium can only be calculated *ex post*: The car wash will add and lose employees during the course of the year, and employees will work extra hours or take days off, depending on workload and personal circumstances. Consequently, the car wash will pay the final premium after its policy has expired and it has submitted actual employment information for the year to the insurer.

Procaccio first contracted with West Bend for workers' compensation insurance in 2001 and renewed the policy annually through at least 2010. The three policies at issue here cover the 2006, 2007, and 2010 calendar years.

West Bend's policies were form contracts created by the National Council. Each policy had several components. The first was the "information sheet," which identified the insured and the actual or estimated premium. The information sheet also listed the endorsements. The second component contained the primary terms and conditions—this was the "policy" in the conventional sense. The final component was a series of endorsements, including those for the Schedule Modification credit and the ICC credit.

As we've noted, workers' compensation policies are continually updated throughout the policy year. West Bend updated Procaccio's policies by issuing new information sheets and endorsements to reflect changes in the employer's payroll history and other elements of the premium formula. For example, when the National Council issued the ICC credit,

West Bend would send Procaccio a new information sheet
reflecting the adjusted premium and an endorsement reflecting
the credit. West Bend calculated Procaccio's final premium in
an audit conducted during the month of March or April
following the expiration of each annual policy.[1]

The policies issued to Procaccio for the three years in
question here contained materially identical terms and condi-
tions. Each one contained the following clause:

> A. The Policy
>
> This policy includes at its effective date the
> Information Page and all endorsements and
> schedules listed there. It is a contract of insur-
> ance between you (the employer named in Item
> 1 of the Information Page) and us (the insurer
> named on the Information Page). *The only agree-*
> *ments related to this insurance are stated in this*
> *policy.* The terms of this policy may not be chang-
> ed or waived except by endorsement issued by
> us to be part of this policy.

(Emphasis added.) Because the three policies were identical in
all relevant respects, we will refer to them collectively as "the
policy" unless the context requires otherwise.

---

[1] The actual dates of West Bend's audits were April 24, 2007 (for the 2006
policy); March 25, 2008 (for the 2007 policy); and April 18, 2011 (for the
2010 policy).

Every year West Bend issued an endorsement reflecting the credit due to Procaccio under the Illinois Contracting Classification Premium Adjustment Program, which subsidizes employers that pay above-average wages by reducing their workers' compensation premiums. The amount of the subsidy depends on the size of the employer's work force and its average hourly wage. As a large, high-wage union employer, Procaccio usually received a sizable ICC credit every year, sometimes exceeding $100,000.

To obtain the ICC credit (also called the ICC "factor"), Procaccio had to apply to the National Council, which is tasked with calculating the amount of the credit. This calculation, however, was often unavailable at policy-renewal time, when West Bend had to re-estimate Procaccio's annual premium. So the policy carried the following general endorsement:

> The premium for the policy may be adjusted by an Illinois Contracting Classification Premium Adjustment factor. The factor was not available when the policy was issued. If you qualify, or if an estimated factor has been applied, we will issue an endorsement to show the proper premium adjustment factor after it is calculated.

When the National Council later calculated the amount of Procaccio's ICC credit, West Bend would issue a specific endorsement applying the credit to the previously estimated premium.

Because Procaccio usually received a large ICC credit every year, West Bend claims that the parties agreed to a special

arrangement for the 2006, 2007, and 2010 policy years whereby West Bend would "front" the credit to Procaccio. The insurer did this by inflating a different credit—the Schedule Modification credit—by the amount it anticipated Procaccio would receive as its ICC credit when the National Council's calculation eventually became available. When the actual ICC credit issued, West Bend then decreased the previously inflated Schedule Modification credit, essentially using the ICC credit as an offset. West Bend refers to this process as its "premium adjustment procedure."

More specifically:

> (1) In 2006 West Bend issued an initial Schedule Modification credit of 51.7%, but reduced the credit to 30% in a January 26, 2006 endorsement, amounting to a reduction in the credit of $180,681.

> (2) In 2007 West Bend issued an initial Schedule Modification credit of 53%, but reduced the credit to 30% in a January 2, 2007 endorsement, amounting to a reduction in the credit of $78,053.

> (3) In 2010 West Bend issued an initial Schedule Modification credit of 10%, but reduced the credit to 7% in a March 25, 2010 endorsement, amounting to a reduction in the credit of $1,199.

If West Bend's allegations about the offset procedure are true, this method of fronting the credit was odd. The ICC credit and the Schedule Modification credit are separate adjustments

to the premium. Insurance companies use the Schedule Modification credit to adjust premiums based on workplace risk factors not otherwise adequately reflected in the premium formula. These adjustments are spelled out in a Schedule Rating Plan. (We'll explain this part of the premium formula in more detail later.)

West Bend contends that Doris Procaccio, the company's president, orally agreed to this fronting arrangement after West Bend agents personally explained it to her and sent her written information about it via e-mail. Procaccio denies that allegation.

In 2011 Procaccio retained an auditing firm to review its workers' compensation insurance for excessive charges. The auditors found what they thought were overcharges and on Procaccio's behalf sent a letter to the Illinois Department of Insurance alleging that West Bend had overcharged Procaccio during the three policy years based on the credit-offset procedure we've just described. The Department concluded that the offsets were not authorized by Illinois law, *see* § 5/143.17a, though it acknowledged that the arrangement was "beneficial to the insured," obliquely suggesting that Procaccio would reap a windfall by keeping the benefit of both the inflated Schedule Modification credit and the full ICC credit.

West Bend requested a hearing, arguing that section 5/143.17a, which regulates how an insurance company provides notice before materially altering its rates, was inapplicable. The Department declined the request, concluding that the parties' dispute did not raise a regulatory concern but

instead was a contract matter between the insurer and its insured.

West Bend then brought this suit seeking a declaratory judgment that the credit offsets were proper and no refund was owed. Procaccio counterclaimed alleging that West Bend breached the insurance policy and also violated Illinois insurance law, § 5/462b, because the procedure used to alter the premiums did not comport with the insurer's Schedule Rating Plan.

Ruling on Procaccio's motions to dismiss and for summary judgment, the district judge held that the insurance policy was an integrated contract and therefore parol evidence of an oral agreement to front Procaccio's ICC credit was barred. Because the credit-offset procedure was extracontractual, the judge concluded that West Bend's premium adjustments breached the insurance policy, resulting in overcharges for the contested policy years. The judge awarded damages of $259,933 plus $72,439.20 in prejudgment interest. This award fully compensated Procaccio; there was no need to address the additional claim that the offsets violated Illinois insurance law.

## II. Discussion

The judgment combines rulings on Procaccio's motions to dismiss and for summary judgment, which we review de novo. *See Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014) (summary judgment); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010) (motion to dismiss). Illinois law controls this

dispute. *See Ryerson Inc. v. Federal Ins. Co.*, 676 F.3d 610, 611–12 (7th Cir. 2012).

Illinois courts interpret insurance policies under the same rules of construction as other contracts. *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005). Insurance contracts are construed as a whole, and policy language is interpreted in accordance with its plain meaning. *Gen. Cas. Co. of Ill. v. Carroll Tiling Serv., Inc.*, 796 N.E.2d 702, 707–08 (Ill. App. Ct. 2003). Unambiguous language is given effect unless it violates public policy. *Hobbs*, 823 N.E.2d at 564.

## A. West Bend's Policy Was Integrated

For West Bend to prevail, it must prove that Procaccio agreed to the credit-offset procedure we've described above. On its face the insurance policy contains no such agreement.[2] West Bend's case depends on parol evidence of a separate understanding between the parties. But the parol-evidence rule bars extrinsic evidence of separate terms if the written contract was integrated—that is, if it was intended to be the final and complete expression of the parties' agreement. So our first question is whether the insurance contract was integrated. We conclude that it was.

---

[2] West Bend insists that its authority to offset the credits can be found by implication from a broad reading of its general authority to issue endorsements. We address this argument in the next section.

A written contract is fully integrated when it is intended by the parties to be a complete and exclusive statement of the agreement's terms; a contract is only partially integrated if it is intended as an incomplete expression (though a final expression on certain terms). *See J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 642 N.E.2d 1215, 1219–20 (Ill. 1994); RESTATEMENT (SECOND) OF CONTRACTS § 210 (1981). When a contract is fully integrated, the parol-evidence rule bars evidence of prior or contemporaneous agreements within the scope of the written contract. If a contract is only partially integrated, the parol-evidence rule permits evidence of consistent additional terms, but parol evidence may not be used to explain the writing or to introduce terms that contradict the written agreement. *Merk v. Jewel Food Stores Div. of Jewel Cos.*, 945 F.2d 889, 892–93 (7th Cir. 1991); RESTATEMENT (SECOND) OF CONTRACTS § 213. Finally, if the contract is integrated, parol evidence is not admissible for the purpose of showing that a facially unambiguous provision contains a latent ambiguity. *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885 (Ill. 1999).

As we've noted, West Bend's policy contains the following clause: "*The only agreements related to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy.*" This is standardized language common to many insurance contracts. In a case involving identical policy language, the Illinois Appellate Court held that the contract was integrated.[3] *Carroll*

---

[3] The court in *Carroll Tiling Service* ultimately found an ambiguity in the

(continued...)

*Tiling Serv.*, 796 N.E.2d at 708 (explaining that the "only agreement" language "limits the terms of the insurance contract to those contained in the policy").

Other courts too have held that insurance policies containing similar language are integrated. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Rodriguez*, 987 N.E.2d 896, 905 (Ill. App. Ct. 2013) (finding that logically equivalent language—"[t]his policy contains all of the agreements between [certain parties]"—is an integration clause); *see also Woods Masonry, Inc. v. Monumental Gen. Cas. Ins. Co.*, 198 F. Supp. 2d 1016, 1031 (N.D. Iowa 2002); *Curran v. Indus. Comm'n of Ariz.*, 752 P.2d 523, 524 (Ariz. Ct. App. 1988); *Liberty Mut. Ins. Co. v. Ben Lewis Plumbing, Heating & Air Conditioning, Inc.*, 710 A.2d 338, 342 (Md. Ct. Spec. App. 1998); *Nat'l Union Fire Ins. Co. of Pittsburgh v. St. Barnabas Cmty. Enters.*, 851 N.Y.S.2d 473, 474 (N.Y. App. Div. 2008).

West Bend argues that the policy was not integrated because it allowed for future endorsements. The possibility of future endorsements does not defeat integration. An integration clause precludes consideration of *prior* and *contemporaneous* oral agreements; it says nothing about the parties' ability to amend or negotiate new contractual terms in the future. *See In re Vic Supply Co. Inc. v. Bank One Ill., N.A.*, 227 F.3d 928, 933 (7th

---

[3] (...continued)
relationship between two provisions in the policy and thus admitted extrinsic evidence. *See Gen. Cas. Co. of Ill. v. Carroll Tiling Serv., Inc.*, 796 N.E.2d 702, 708 (Ill. App. Ct. 2003).

Cir. 2000). The fact that West Bend reserved the right to amend the policy by subsequent written endorsement does not address the question whether the policy was integrated with respect to prior or contemporaneous oral terms.

West Bend cites two cases to support its position that the policy was not integrated. The first construed policy language appearing under the heading "Changes" and addressing how the policy could be amended:

> This Policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of the policy.

*Cincinnati Ins. Co. v. River City Const. Co.*, 757 N.E.2d 676, 681 (Ill. App. Ct. 2001), *overruled on other grounds by Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E.2d 269 (Ill. 2004). The Illinois Appellate Court concluded that this language "does not express the parties' intent to establish the contract as their entire and integrated agreement superceding all other agreements. Rather, the Changes clause prevents unilateral modifications of the policy." *Id.* West Bend's second case is a decision of a federal district court in Northern Illinois simply following the holding of *Cincinnati Insurance* without further analysis. *See Longview Aluminum, L.L.C. v. United Steel Workers of Am.*, 213 F. Supp. 2d 876, 881 (N.D. Ill. 2002).

We're not persuaded that these cases undermine the plain meaning of the "only agreements" clause in West Bend's policy. Read as a whole, the provision at issue in *Cincinnati Insurance* focused on how the policy could be changed; it was titled "Changes," after all, and the second and third sentences of the provision addressed mutual amendments and unilateral endorsements by the insurance company. More importantly, however, the *Cincinnati Insurance* court never explained how the first sentence in the "Changes" clause—"[t]his Policy contains all the agreements between you and us concerning the insurance afforded"—was insufficient as an integration clause. The "all agreements" language is unambiguous and ordinarily indicates that the contract is integrated, as the Illinois Appellate Court held in another case. *See State Farm Mut. Auto. Ins. Co.*, 987 N.E.2d at 905 (holding that identical "all agreements" language—"[t]his policy contains all of the agreements between [the parties]"—is an integration clause).

Moreover, as we've already noted, an insurance policy can be both integrated and also reserve the insurer's right to issue endorsements. To repeat: integration clauses exclude extrinsic evidence of *prior* and *contemporaneous* agreements; they do not preclude later contractual amendments in accordance with rights reserved in the contract. The *Cincinnati Insurance* court overlooked this point, and the district court in *Longview* simply followed *Cincinnati Insurance* with no independent analysis. For these reasons, we do not find either case persuasive.

Nor are we permitted to look to extrinsic evidence for the purpose of determining whether the insurance contract is

integrated in the first place. For cases outside the scope of the Uniform Commercial Code, Illinois courts look to the writings alone to determine whether a contract is integrated, which is a question of law for the court. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878 (7th Cir. 2005); *J & B Steel Contractors*, 642 N.E.2d at 1219; *Eichengreen v. Rollins, Inc.*, 757 N.E.2d 952, 957 (Ill. App. Ct. 2001). Illinois thus breaks from the modern approach, which permits parol evidence to determine whether the contract is integrated. *J & B Steel Contractors*, 642 N.E.2d at 1219. *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 214 (adopting the modern approach).

Accordingly, West Bend's case stumbles as it leaves the gate. The insurance contract expressly provides that the only agreements between West Bend and Procaccio are those stated in the policy. West Bend's case relies on a separate agreement with Mrs. Procaccio. But where, as here, the contract is integrated, the parties are limited to the four corners of the written agreement for any matter within the scope of the agreement. Because West Bend's policy was integrated, parol evidence of the alleged separate agreement is inadmissible.

### B. Nothing in the Insurance Policy Allows the Credit Offsets

With parol evidence off the table, West Bend must establish a basis for the credit-offset procedure in the language of the policy itself. The insurer claims that several provisions contemplate the procedure, if only implicitly. First, West Bend points to the ICC Adjustment Endorsement, which states:

> The premium for the policy may be adjusted by an Illinois Contracting Classification Premium Adjustment factor. The factor was not available when the policy was issued. If you qualify, or if any estimated factor has been applied, *we will issue an endorsement to show the proper premium adjustment factor after it is calculated.*

(Emphasis added.) West Bend argues that the highlighted language authorized it to manipulate the Schedule Modification credit as it did. We do not see how. The endorsement's reference to the "proper premium adjustment factor" can only be read to refer to the subject matter of the endorsement, which is the *ICC credit* (or "factor"). Nothing in this language implies the authority to offset another, completed unrelated credit by the amount of the ICC credit.

Second, West Bend relies on its general authority to issue endorsements, arguing that endorsements are valid and enforceable parts of the policy. That's certainly true, *see Rockford Mut. Ins. Co. v. Econ. Fire & Cas. Co.*, 576 N.E.2d 1141, 1144 (Ill. App. Ct. 1991), but it doesn't help West Bend's position. The insurer's authority to adjust the Schedule Modification credit by endorsement is subject to contractual and regulatory limits.

Workers' compensation insurers use Schedule Rating Plans to adjust their premiums to account for risk characteristics not encompassed by other rating factors. West Bend's Schedule

Rating Plan identified six workplace-safety characteristics, together with a range of permissible modifications.[4]

As a general matter, the policy states that the premium "will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance."[5] And Illinois law requires insurance companies to "apply correct classifications, payrolls and other factors of a rating system to compute premiums." § 5/462b.

---

[4]

| Risk Characteristics | Range of Modification |
|---|---|
| 1. Premises–Upkeep, condition | 20% credits – 30% debit |
| 2. Classification Peculiarities | 15% credits – 30% debit |
| 3. Medical Facilities | 10% credits – 30% debit |
| 4. Safety Devices | 10% credits – 30% debit |
| 5. Employees—Selection, training, supervision and experience | 20% credits – 30% debit |
| 6. Management | 10% credits – 30% debit |

The total range of modifications could not exceed 70%, either as credits or debits.

[5] Another page contained similar language: "THE PREMIUM FOR THIS POLICY WILL BE DETERMINED BY OUR MANUALS OF RULES, CLASSIFICATIONS, RATES, AND RATING PLANS. ALL INFORMATION REQUIRED BELOW IS SUBJECT TO VERIFICATION AND CHANGE BY AUDIT. ADJUSTMENT OF PREMIUM SHALL BE MADE ANNUALLY."

The district judge was under the impression that West Bend conceded that any "changes must conform to its manuals of rules, rates, rating plans and classifications." The judge accordingly concluded that West Bend violated the policy by altering the Schedule Modification credit without justifying the change based on the relevant risk characteristics in its Schedule Rating Plan.

This reasoning rests on a faulty understanding of West Bend's position. West Bend conceded only that the *final premium* had to comport with its Schedule Rating Plan. The policy required West Bend to apply its rating plan, and Illinois law mandates that workers' compensation insurers apply correct classifications, based on their rating plans, to compute an employer's premium. When altering an already properly set rate, an endorsement must conform to the insurer's rating plan in order for the final premium to comport with the plan. But if, for example, an initial credit is set at an erroneous level, an endorsement correcting the credit would result in a premium that complied with both the policy and Illinois insurance law, even if the amount of the adjustment *itself* could not be justified by the factors listed in the insurer's rating plan.

So although West Bend agrees that the actual *final premium* must be based on correct classifications and rates it had on file with the Illinois Department of Insurance, it insists that these requirements are irrelevant to the premium-adjustment procedure at issue here. West Bend thus argues that its Schedule Rating Plan does not control how the insurer and its insured may agree to structure the premium, and that in the

end, Procaccio's final premiums for the three contested policy years conformed to its approved rates on file with the Department. Put more succinctly, West Bend argues that fronting the ICC credit through the Schedule Modification credit did not actually alter Procaccio's final premium. Rather, Procaccio simply received the benefit of not having to pay a higher estimated premium while awaiting the calculation of its ICC credit.

For this argument to work, West Bend must show that the initial Schedule Modification credits issued during the three policy years were not the "true" credits. For example, in 2006 West Bend initially issued a Schedule Modification credit of 51.7% and later reduced it to 30% when Procaccio's ICC credit issued. West Bend's argument rests on the premise that 30% is the true Schedule Modification credit, while the initial 51.7% included both the true credit *and* the estimated ICC credit.

As we've noted, the premium discount reflected by the Schedule Modification credit is determined by West Bend's filed rates, which look to such safety factors as the employer's upkeep of its workplace, the existence of safety equipment, and the presence of medical facilities on the premises. West Bend may have some discretion in setting the precise Schedule Modification credit because its Schedule Rating Plan authorizes a broad range for each of these risk characteristics. For example, the Schedule Rating Plan authorizes a 10% credit to 30% debit for the presence or absence of onsite medical facilities. But it's not at all clear whether West Bend's rating plan

meticulously controls the credit or debit amount within this range, or if West Bend exercises discretion.

If West Bend's rating plan controls the exact amount of credit or debit issued, then West Bend should be able to produce evidence showing which of the two figures was the true Schedule Modification credit for the contested policy years. The factors listed in the Schedule Rating Plan—the condition of Procaccio's premises, the existence of safety features, and so on—are extrinsic facts that justify a certain rate. In fact, the Schedule Rating Plan itself requires West Bend to maintain evidence justifying the specific credit or debit it provides to the insured. And unlike the alleged "side agreement" to front the ICC credit, none of this evidence would be barred by the parol-evidence rule. In essence, West Bend is arguing that if it did anything improper in determining the Schedule Modification credit, it was in setting the initial credit at an inflated level, not in subsequently modifying it. But to support this claim, West Bend needed to produce evidence (apart from inadmissible parol evidence) showing that the lower credits during the contested policy years are in fact the true ones. It has not proffered any such evidence.

Instead, West Bend has framed its case around the alleged oral agreement with Mrs. Procaccio. This amounts to an argument that the true Schedule Modification credit was set by stipulation during the contested policy years. But West Bend cannot make that case without resorting to parol evidence.

In sum, we find no support in the policy for West Bend's assertion that the Schedule Modification credit during these

three policy years included both the true Schedule Modification credit *and* the ICC estimate. Nor has West Bend explained how, without resorting to inadmissible parol evidence, it could prove an agreement to front the ICC credit by temporarily inflating the Schedule Modification credit.

## C. Defenses

West Bend also raises two affirmative defenses to Procaccio's counterclaims: laches and equitable estoppel. Neither defense applies.

### 1. *Laches*

Laches is a defense to liability "when a party's failure to timely assert a right has caused prejudice to the adverse party." *Van Milligan v. Bd. of Fire & Police Comm'rs*, 630 N.E.2d 830, 833 (Ill. 1994). The defense has two elements: "lack of due diligence by the party asserting the claim and prejudice to the opposing party." *Id.* West Bend raises a colorable claim that Procaccio's failure to assert an overcharge claim after the 2006 policy year took unfair advantage of its contract assumptions in the 2007 and 2010 policy years. *See Monson v. County of Grundy*, 916 N.E.2d 620, 623 (Ill. App. Ct. 2009) ("The doctrine of *laches* is grounded on the principle that courts are reluctant to come to the aid of a party who knowingly slept on his rights to the detriment of the other party.").

Traditionally, laches is a defense to an equitable claim "based on the maxim, '*vigilantibus non dormientibus aequitas subvenit*,' meaning 'equity aids the vigilant, not those who sleep on their rights.'" *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998) (quoting *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997)). With the merger of law and equity, equitable defenses have been allowed in actions at law. *Maksym v. Loesch*, 937 F.2d 1237, 1248 (7th Cir. 1991). *But cf. Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1973 (2014) (invoking the distinction between law and equity and stating that where Congress has provided a statute of limitations for an action at law, "this Court has cautioned against invoking laches to bar legal relief").

As a general matter, Illinois courts have recognized that laches can apply beyond equity to actions at law. *See, e.g.*, *Monson*, 916 N.E.2d at 624; *Bill v. Bd. of Ed.*, 812 N.E.2d 604, 612 (Ill. App. Ct. 2004). For example, in *Bill* the Illinois Appellate Court stated:

> While we agree that traditionally, statutes of limitation were generally applied to legal actions and the *laches* doctrine was applied to those actions based in equity, such "mechanical" applications are no longer followed. Courts have applied *laches* to "equity-like" actions, such as *mandamus*, to quasi-equitable suits, to actions where equitable considerations are at the heart of a claim actually based in law, as well as to purely legal claims.

812 N.E.2d at 612 (citation omitted).

This court too has recognized that Illinois has begun to erode the distinction between legal and equitable defenses. *Nature Conservancy v. Wilder Corp. of Del.*, 656 F.3d 646, 649–51 (7th Cir. 2011). Still, we have yet to find a case in which an Illinois court has applied laches to bar a breach-of-contract suit seeking only monetary damages. *Id.* at 650–51. West Bend has not identified one, nor has it argued that developments in Illinois law require us to revisit our precedent and apply laches to a breach-of-contract claim.

Instead, West Bend simply recharacterizes Procaccio's claim in equitable terms. Because Procaccio sought damages in the amount of the excess premiums it paid, West Bend argues that Procaccio's counterclaim is really an equitable claim for disgorgement.

This argument cannot be squared with Illinois law on contract damages. "The measure of damages for breach of contract is the amount that will compensate the aggrieved party for the loss 'which either fulfillment of the contract would have prevented or which the breach of it has entailed.'" *Santorini Cab Corp. v. Banco Popular N. Am.*, 999 N.E.2d 46, 52 (Ill. App. Ct. 2013) (quoting *LeFevour v. Howorka*, 586 N.E.2d 656, 658 (Ill. App. Ct. 1991)). Disgorgement recovers the benefit that the defendant gained from the wrong, thereby preventing the wrongdoer from profiting by his improper action. Expectation damages, on the other hand, measure the loss to the injured party caused by the breach; they restore the injured party to the place it would have been in had the contract been

performed. *See* E. Allan Farnsworth, *Your Loss or My Gain? The Dilemma of the Disgorgement Principle in Breach of Contract*, 94 YALE L.J. 1339, 1341 (1985). Illinois, like other states, applies expectation damages to breach-of-contract actions. *Santorini Cab Corp.*, 999 N.E.2d at 52 ("The purpose of damages is to put the nonbreaching party into the position he or she would have been in had the contract been performed … ." (quoting *Walker v. Ridgeview Constr. Co.*, 736 N.E.2d 1184, 1187 (Ill. App. Ct. 2000)).

In a dispute over a price set by contract, as this one is, these measures are equal. By mispricing its product, West Bend only gained what Procaccio lost. But the happenstance in a particular case that a party's loss equals the wrongdoer's gain does not transform a breach-of-contract action into an equitable action for disgorgement. *Cf. Sundance Homes, Inc. v. County of DuPage*, 746 N.E.2d 257, 270 (Ill. 2001) (cautioning, with respect to avoiding a statute of limitations, that "the shrewd advocate … will attempt to manipulate the outcome by casting his action as one in equity in order to take advantage of the amorphous quality of *laches* analysis"). Laches does not apply.

### 2. *Equitable Estoppel*

In the alternative, but on essentially the same rationale, West Bend argues that equitable estoppel applies. The similarity is unsurprising; in substance, laches is a doctrine of estoppel. *Maksym*, 937 F.2d at 1248.

To claim equitable estoppel, a party must demonstrate that:

(1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof.

*Geddes v. Mill Creek Country Club, Inc.*, 751 N.E.2d 1150, 1157 (Ill. 2001).

West Bend can raise equitable estoppel as an affirmative defense only if it reasonably relied upon Mrs. Procaccio's oral representations. But the whole purpose of an integration clause is to declare that there are no previous or contemporaneous agreements not contained in the written contract. *See* E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.3 (3d. ed. 2004). West Bend renews its argument that the insurance policy is not integrated, but we have decided otherwise. West Bend drafted the policy and its endorsements, and as a sophisticated contract partner, it easily could have included the terms of the premium-adjustment procedure somewhere in the policy

documents. Using equitable estoppel to admit evidence of a separate contemporaneous oral agreement would circumvent the basic purpose of the parol-evidence rule. *Cf. Prentice v. UDC Advisory Servs., Inc.*, 648 N.E.2d 146, 153 (Ill. App. Ct. 1995) (refusing to extend promissory estoppel in a way that would undermine the parol-evidence rule). Equitable estoppel does not apply.

### D. Prejudgment Interest

In a separate order, the district court awarded prejudgment interest from the date of West Bend's annual audits for each of the three contested policy years. West Bend objects and argues that a refund became due (if at all) only after Procaccio alerted it of a dispute about the final premium. We review the district court's ruling for an abuse of discretion. *Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 631 (7th Cir. 2009).

The Illinois Interest Act grants interest of 5% per year "for all moneys after they become due on any … instrument of writing." 815 Ill. Comp. Stat. 205/2. Insurance policies are "instruments of writing" under this section, so prejudgment interest is recoverable from the time the money became "due" under the policy. *Twenhafel*, 581 F.3d at 631; *N.H. Ins. Co. v. Hanover Ins. Co.*, 696 N.E.2d 22, 27 (Ill. App. Ct. 1998). Amounts are due only if they are fixed or easily calculated. *Twenhafel*, 581 F.3d at 631. A good-faith dispute "does not preclude the recovery of prejudgment interest on money due under an instrument of writing." *N.H. Ins.*, 696 N.E.2d at 28.

Under the policies, Procaccio's final premium became due when West Bend applied the actual premium basis and proper classifications under the policy. As we've explained, workers' compensation insurance involves retrospective ratings, so the final premium was calculated during an audit after the policy year ended, when West Bend knew Procaccio's actual employ-ment data for the year. *See* § 5/462b (requiring insurance companies to apply correct classifications and refund excess premiums). The precise amount West Bend owed for improp-erly lowering the Schedule Modification credit by the amount of the ICC credit was ascertainable at that time. This was so even if West Bend had a good-faith argument that its offset procedure did not breach the insurance contract.

West Bend has cited no authority for the proposition that an amount due under a written instrument becomes fixed or readily ascertainable only after the counterparty gives fair warning of a dispute about payment. The district court correctly awarded prejudgment interest from the date of West Bend's audit for each of the three contested policy years.

### III. Conclusion

As the Illinois Department of Insurance implied, the end result of West Bend's unusual manipulation of the ICC and Schedule Modification credits may be a windfall to Procaccio. But the credit-offset procedure is extracontractual, and any evidence of an oral agreement authorizing it is inadmissible.

AFFIRMED.