In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 19-2300, 19-3122, & 19-3235

STERLING NATIONAL BANK,

*Plaintiff/Counterclaim Defendant-*
*Appellant/Cross-Appellee,*

*v.*

BERNARD N. BLOCK, et al.,

*Defendants/Counterclaim Plaintiffs-*
*Appellees/Cross-Appellants.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-09009 — **Harry D. Leinenweber**, *Judge.*

———————————

ARGUED SEPTEMBER 23, 2020 — DECIDED JANUARY 5, 2021

———————————

Before SYKES, *Chief Judge*, and HAMILTON and ST. EVE, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In 2015, plaintiff Sterling National Bank purchased the Damian Services Corporation from its prior owners (the defendant Sellers). The stock purchase agreement set up an escrow of two million dollars available to resolve disputes that might arise after the purchase. The

parties dispute here the right to the escrowed money. The issues are governed by the elaborate Stock Purchase Agreement in which the parties set up a comprehensive, custom-tailored set of rights, obligations, remedies, and procedures for resolving disputes.

Shortly after the purchase, a disgruntled former Damian employee called some of Damian's clients to tell them of a billing practice that the Sellers had instituted years earlier. When Sterling learned of the situation, it investigated with the help of a law firm and forensic accountant. After several months, Sterling concluded that under the Sellers' management, Damian had overcharged its clients by over one million dollars. Sterling refunded these overpayments to each of its current clients, but not to any former clients.

Sterling then demanded indemnification from the escrow. Sterling claimed that the Sellers had misrepresented Damian's liabilities and vulnerability to litigation. The Sellers refused, leading to this lawsuit. The district court granted summary judgment to the Sellers on the theory that Sterling missed the seemingly strict deadline for claiming indemnification under the stock purchase agreement. The district court then denied the Sellers' request for statutory pre- and post-judgment interest on the escrow money. Both sides have appealed.

We reverse summary judgment for the Sellers. Whether Sterling's demand for indemnification was late depends at best on disputed facts. Even if the demand was late, however, the agreement's elaborate terms provide that any delay could be held against Sterling only "to the extent that [Sellers] irrevocably forfeit[] rights or defenses by reason of such failure." Undisputed facts show that the Sellers have not irrevocably

forfeited any claims or defenses, so the timing of Sterling's demand does not matter. We decline both sides' invitations to decide the merits of Sterling's claims as a matter of law in the first instance. We agree with the district court's denial of pre- and post-judgment interest. We remand to the district court for further proceedings on the merits.

I. *Factual and Procedural Background*

   A. *Damian's Billing Practices*

The Damian Services Corporation provides various administrative and payroll services to independent temporary staffing companies ("temp agencies"). To explain the parties' dispute, we must explain how Damian serves and bills its clients. The baseline level of service, offered to "money-only" clients, is that Damian provides short-term payroll funding to pay the temp agencies' employees. Damian offers other services to "full service" clients. Although Damian contracted with its temp agency clients, it invoiced the end-user companies that hired the temporary workers. The end-user employers would then pay Damian, which would, in turn, send the payments to the temp agencies after taking its cut as a fee for its services.

Damian encourages its client staffing agencies to obtain prompt payment from the end-user employers. If the end-user employers pay quickly, then the temp agencies can pay Damian faster and will be eligible for a discount. If an end-user waits too long and payment to Damian is delayed, Damian assesses a late fee to its client. The parties agree that Damian negotiated these discounts and fees (including timing) with every client temp agency. Despite variations in rates

and other terms, however, the underlying client contracts always pegged these discounts and late fees to the invoice date.

The parties dispute the exact contours of Damian's billing and invoice-dating practices before the 2009 change. In broad brushstrokes, Damian would generally wait until it had received all the necessary information about each temporary employee's hours and rates before issuing an invoice. The invoice would thus be issued and dated some time after the workweek had ended—generally on a Friday, five business days after the preceding Sunday. Damian marketed this delay in processing payment as a benefit to potential clients.

In 2009, however, Damian began dating its invoices as of the last day of the workweek, that is, Sunday. The date listed on an invoice was thus earlier than not just the generation and remission of the invoice, but also, in some cases, even Damian's receipt of the information needed to generate it. This change gave Damian's clients a narrower window to receive early-payment discounts and a larger chance of being hit with late-payment fees. Sterling refers to this practice as a "backdating" scheme. For the sake of neutrality, we refer to it more blandly as "the 2009 change."

There is evidence that Damian took steps to hide the 2009 change from its clients. Damian never publicized the change, although it had previously alerted its clients to other changes in business practices that could affect them. There is also evidence that Damian developed a script for its employees to follow if a client ever complained. Employees were instructed to tell the complaining client that they would "look into it," would seek approval for a "change back" to the previous billing scheme, and, if a change were approved, would refund fees and tell the client that Damian would have caught the

(deliberate) dating change by the end of the quarter. Several clients noticed and complained, but dozens of other did not.

B.  *Sale, Investigation, and Indemnification Demand*

More than five years later, on February 27, 2015, the Sellers sold Damian to Sterling for a little over $25 million. Under what we call "the Agreement," the Stock Purchase Agreement at the center of these appeals, Sterling deposited two million dollars of the purchase price in an escrow account. If no disputes arose by December 31, 2015, one million dollars would be released to the Sellers, and the rest would be released in August 2016, eighteen months after closing.

In July 2015, soon after the closing, a former Damian employee began contacting Damian clients to expose the 2009 change. Sterling, which says it had not known before about the 2009 change, quickly investigated. It retained the law firm Wachtell, Lipton, Rosen & Katz to investigate. Sterling also placed an internal hold on all documents relevant to the investigation and told Damian's temp agency clients that it had uncovered a billing discrepancy. By August 11, 2015, Wachtell Lipton had prepared a preliminary memorandum on potentially fraudulent billing practices. The next day, Wachtell Lipton discussed its initial findings in a telephone call with the U.S. Attorney's Office in the Northern District of Illinois as a potential case of corporate fraud. Sterling also hired a forensic accounting firm, AlixPartners, which calculated that if the 2009 change had not occurred, Damian's clients would have saved $1,289,916 in discounts and avoided late fees.

As Wachtell Lipton wrapped up its investigation, it drafted another memorandum, dated November 27, and presented it to the U.S. Attorney's Office on December 2. The

prosecutors declined to take up the case. Nine days later, on December 11, 2015, Sterling sent the Sellers a formal notice demanding indemnification under the Agreement. Before the Sellers responded, Sterling contacted each of Damian's then-current clients that it had determined had been overcharged and offered full refunds on the overcharges.

The Sellers rejected Sterling's demand. They said that the thirty-page demand did not provide sufficient detail on how the total amount was computed. The Sellers refused to participate in the Agreement's process for resolving indemnification claims. As a result of the dispute, no escrow funds have been released.

C. *Procedural History*

Sterling filed this suit in September 2016 seeking indemnification under the Agreement. Sterling's claims arise under state law; federal jurisdiction rests on diversity of citizenship. The operative complaint alleges that the Sellers' failure to disclose the 2009 change and its consequences breached the Sellers' representations and warranties in the Agreement, and that the Sellers breached the Agreement by refusing to indemnify Sterling. The Sellers counterclaimed for, among other things, a declaratory judgment holding that Sterling is not entitled to indemnification and that the Sellers are entitled to pre- and post-judgment interest at 12% on the money in escrow.

Sterling and the Sellers filed cross-motions for summary judgment. Sterling argued that undisputed facts showed that the Sellers are liable for breaching warranties and representations in the Agreement. The Sellers argued that Sterling failed

to follow the Agreement's procedures for demanding indemnification. In the alternative, the Sellers argued that the 2009 change of invoice dates did not actually breach any underlying client contracts, so that no representations or warranties were breached.

The district court granted summary judgment for the Sellers on the narrow procedural ground that Sterling's indemnification notice was too late and that the delay prejudiced the Sellers. Sterling appealed. After some confusion about whether any counterclaims remained pending, the district court reopened the case and then denied the Sellers' motion for pre- and post-judgment interest. Although the district court did not issue an amended Rule 58 judgment, both sides appealed.

II. *Appellate Jurisdiction*

We must first consider whether these appeals are properly before us. The lack of a separate, final Rule 58 judgment makes the appellate jurisdiction picture messier than necessary. The district court noted in its summary judgment opinion that neither side had addressed all of the Sellers' counterclaims but still entered judgment for the Sellers pursuant to Rule 58. The court later reopened the case because some claims had not yet been resolved. The Sellers then voluntarily dismissed two of their counterclaims and explained that the only remaining issues were whether they were entitled to pre- and post-judgment interest and their costs. The court ruled on those outstanding motions without issuing an amended Rule 58 judgment.

Rule 58 requires: "Every judgment and amended judgment must be set out in a separate document . . . ." Fed. R. Civ.

P. 58(a). This "'separate document' requirement is important because it keeps jurisdictional lines clear." *Wisconsin Central Ltd. v. TiEnergy, LLC*, 894 F.3d 851, 854 (7th Cir. 2018). This formality is not, however, a "prerequisite to appealing. The losing party can appeal a judgment … before the entry of the Rule 58 judgment order if … the judgment really is final within the meaning of 28 U.S.C. § 1291." *Borrero v. City of Chicago*, 456 F.3d 698, 699–700 (7th Cir. 2006). We may exercise appellate jurisdiction without an amended Rule 58 judgment "if the district court has otherwise indicated its intent to finally dispose of all claims." *Wisconsin Central*, 894 F.3d at 854.

When a district court grants declaratory relief, the court "must declare specifically and separately the respective rights of the parties, not simply state in a memorandum opinion, minute order, or a form prescribed for judgment in a civil case that a motion has been granted or denied." *Calumet River Fleeting, Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 824 F.3d 645, 651 (7th Cir. 2016) (cleaned up), quoted in *INTL FCStone Financial Inc. v. Jacobson*, 950 F.3d 491, 502 (7th Cir. 2020). But "we may nevertheless have jurisdiction if the practicalities weigh heavily toward a common sense conclusion that the district court intended to enter a final judgment." *Id.*[1]

Here, the district court's opinions and orders show it intended to dispose of all claims. See *Sterling National Bank v.*

---

[1] In a civil case where the district court has failed to render a Rule 58 judgment, "we treat judgment as entered 150 days after the entry of the judgment or order on the civil docket." *Calumet River Fleeting*, 824 F.3d at 650, citing Fed. R. Civ. P. 58(c)(2)(B) and Fed. R. App. P. 4(a)(7)(A)(ii). Judgment here was effectively entered no later than March 8, 2020, 150 days after the district court resolved the last pending issues.

*Block*, 2019 WL 5085715 (N.D. Ill. Oct. 10, 2019) ("*Sterling II*") (ruling on costs and pre- and post-judgment interest); *Sterling National Bank v. Block*, Case No. 16-cv-9009, Dkt. 182 ("The case will not terminate until the Court issues a ruling on costs and pre- and post-judgment interest."); see also Dkt. 206 (transcript of hearing memorialized by Dkt. 182). We expect a more thorough accounting of each party's respective rights and obligations at the conclusion of an action seeking declaratory relief. Still, we are confident that the district court intended to enter a final judgment here, especially since it denied the Sellers' declaratory claim in full. See *Calumet River Fleeting*, 824 F.3d at 651. Finally, the Sellers' acknowledgment at oral argument that they had withdrawn their remaining counterclaims with prejudice assures us that the district court disposed of all the claims before it. See *Wetzel v. Glen St. Andrew Living Community, LLC*, 901 F.3d 856, 867 (7th Cir. 2018) (accepting similar concession). We therefore have jurisdiction over these appeals.

III. *Summary Judgment Standard*

"We review a district court's summary judgment ruling de novo and consider the facts and draw all inferences in the light most favorable to the nonmoving party." *Henry v. Hulett*, 969 F.3d 769, 776 (7th Cir. 2020) (en banc); see also *Black Earth Meat Market, LLC v. Village of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016) (considering cross-motions for summary judgment "one at a time, construing all facts and drawing all reasonable inferences in favor of the non-moving party"). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Henry*, 969 F.3d at 776, quoting Fed. R. Civ.

P. 56(a). The parties agree that Illinois law applies to their claims.

"The primary objective in construing a contract is to give effect to the intent of the parties," which is best shown by the language of the contract itself. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232–33, 314 Ill. Dec. 133, 148, 874 N.E.2d 43, 58 (2007). "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 349 Ill. Dec. 936, 944, 948 N.E.2d 39, 47 (2011), quoted in *Soarus LLC v. Bolson Materials Int'l Co.*, 905 F.3d 1009, 1011 (7th Cir. 2018). With contracts with substantial stakes, negotiated between commercially sophisticated parties, we interpret contracts "literally" because such parties "know how to say what they mean and have an incentive to draft their agreement carefully." *Bank of America, N.A. v. Moglia*, 330 F.3d 942, 946 (7th Cir. 2003) (applying Illinois law); see also *West Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 680 (7th Cir. 2015) (applying Illinois law and refusing to ignore contract's plain meaning: the "sophisticated contract partner[] [] easily could have included the terms" it wanted to read into the contract); *Central Illinois Light Co. v. Home Ins. Co.*, 213 Ill. 2d 141, 156, 290 Ill. Dec. 155, 164, 821 N.E.2d 206, 215 (2004) ("[S]ophisticated business entities [] can be assumed to have specialized knowledge of the contractual terms they employ.").

All portions of a contract should be "construed as a whole, viewing each part in light of the others." *Gallagher*, 226 Ill. 2d at 233, 314 Ill. Dec. at 148, 874 N.E.2d at 58. We also try to give meaning to every provision of the contract and avoid rendering any provisions superfluous. *Land of Lincoln Goodwill Indus., Inc. v. PNC Financial Servs. Grp.*, 762 F.3d 673, 679 (7th

Cir. 2014) (applying Illinois law). At the same time, we should also recognize that drafters of contracts, like drafters of statutes, may "intentionally err on the side of redundancy to 'capture the universe.'" See Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—an Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 Stan. L. Rev. 901, 934 (2013); see also *Continental Casualty Co. v. MidStates Reinsurance Corp.*, 388 Ill. Dec. 214, 219, 24 N.E.3d 122, 127 (Ill. App. 2014) (accepting that drafters of contract took the proverbial "belt and suspenders" approach rather than straining to find different meanings).

IV. *Compliance with Indemnification Procedures*

The district court granted summary judgment to the Sellers on the ground that the Agreement does not require indemnification if the notice is too late and the delay causes irrevocable harm. The court reasoned that Sterling's notice was late and left the Sellers without any way to challenge Sterling's offers to reimburse Damian's clients or its six-figure investigation budget.

On appeal, Sterling argues that the court made three errors. First, Sterling defends its notice as timely. Second, Sterling argues that even if its notice was late, any delay should have no consequence because the Sellers have not irrevocably forfeited any rights or defenses. Under the parties' elaborate Agreement, we conclude that the Sellers have not shown that Sterling's demand was late. Also, undisputed facts show that even if Sterling's demand had been late, the Sellers have not irrevocably forfeited any rights or defenses by reason of any delay. We need not reach Sterling's third argument, that factual disputes about the extent of any prejudice to the Sellers preclude summary judgment.

Section 8.05(c) of the Agreement provides the following procedures for indemnification claims between the parties:

> Direct Claims. Any Action by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "Direct Claim") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than ten (10) days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Part of its indemnification obligations, except and only to the extent that the Indemnifying Party irrevocably forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party.

### A. *Late Notice?*

We are not persuaded that Sterling's demand was actually late, or at least that the undisputed facts show it was late. The Agreement required notice within ten days, but only after a party became "aware of" the claim, and it required a demand with "reasonable detail." This combination makes for an ambiguous mess, at least as applied to this dispute. The parties disagree about just how much Sterling needed to know before being "aware of" its claim against the Sellers and whether a

precise trigger is needed to start the ten-day clock for notice. According to Sterling, it did not become "aware of" its claim until Wachtell Lipton completed its investigation, especially since the Sellers contended that even the thirty-page demand that Sterling presented was not detailed enough to count as a proper demand under the Agreement. The Sellers, on the other hand, counter that Sterling became "aware of" the claim no later than August 2015, when Sterling and Wachtell Lipton first presented the basic facts surrounding the 2009 change to the U.S. Attorney's Office.

Section 8.05(c) of the Agreement built in inherent tension between the need to investigate a Direct Claim before making a demand and the need to make a demand within just ten days after becoming "aware of" it. We have studied the Agreement's definitions of Direct Claims and Actions and the need to support a demand for indemnification with a "reasonable" but uncertain quantum of evidence. We conclude that whether Sterling's demand came more than ten days after it became "aware of" its Direct Claim cannot be decided in favor of the Sellers as a matter of law. We also conclude that we need not decide whether Sterling is entitled to summary judgment on the issue. As we explain next, Sterling is entitled to summary judgment on the notice issue on a different basis. Even if its demand was late, the undisputed facts show that the Sellers did not irrevocably forfeit any rights or defenses by reason of the timing of Sterling's demand.

B.  *Irrevocable Forfeiture?*

Section 8.05(c) of the Agreement requires prompt notice of a Direct Claim. Delay is excused, however, unless the Sellers "irrevocably forfeit[] rights or defenses by reason of such failure." The Sellers claim that Sterling's supposed delay caused

them to forfeit three rights: (1) the right to settle the underlying claims with overcharged clients; (2) the right to litigate the underlying breach-of-contract claims with overcharged clients, including raising certain defenses; and (3) the right to investigate as granted by the Agreement. The Sellers cannot show, however, that they have irrevocably forfeited any of these rights. Under § 8.05(c), therefore, the timing of Sterling's indemnification demand could not relieve the Sellers of a duty to indemnify. See Dkt. 135, at *14–15 (Sterling's request for summary judgment on this issue); Dkt. 136, ¶ 66.

First, the Sellers have not irrevocably forfeited the right to settle the underlying claims because they never had that right to begin with. The Sellers argue that Sterling's premature settlements of these claims with current clients for one hundred cents on the dollar deprived them of their right to drive harder bargains. The Sellers cite cases applying Illinois law in the insurance context that have required notice to head off insureds' incentives to overpay when playing with someone else's money.

The problem for the Sellers is that this case does not directly involve any of Damian's clients or temporary employment payroll contracts. To use the Agreement's terms, Sterling has asserted a Direct Claim, not a Third Party Claim: Sterling has sued the Sellers for concealing these *potential* liabilities. Whether Sterling actually paid refunds to Damian's clients or not does not tell us whether it was required to do so. The key liability issue for indemnification is whether the Sellers misrepresented anything in the Agreement. To be sure, if a temp agency had ever sued or threatened to sue Damian for the 2009 change after the 2015 purchase, that would have been a Third Party Claim. Such a claim would have required

the parties to consult before any settlement. See § 8.05(b) ("Settlement of Third Party Claims"). But that is not what happened. The cooperation clauses in § 8.05(b) simply do not apply.

Moreover, the fact that the Agreement expressly requires the parties to cooperate on Third Party Claims implies that there is no such duty on Direct Claims, for which the Agreement says nothing about cooperation. See *Land of Lincoln Goodwill*, 762 F.3d at 679 ("[W]e attempt to … avoid a construction that would render a provision superfluous."); *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 668 (7th Cir. 2008), discussing *Drexel State Bank of Chicago v. O'Donnell*, 344 Ill. 173, 183, 176 N.E. 348, 352 (1931) (Illinois courts use *expressio unius* canon as a rule of construction, but do not allow it to override a contract's unambiguous terms).

The Sellers' citations to insurance cases miss the mark. Many of those cases applied contract language expressly requiring cooperation during litigation or settlement. The parties here drafted their elaborate Agreement without requiring cooperation for Direct Claims. Compare § 8.05(c), with *Waste Management, Inc. v. Int'l Surplus Lines Ins. Co.*, 144 Ill. 2d 178, 192, 161 Ill. Dec. 774, 779, 579 N.E.2d 322, 327 (1991) ("The cooperation clause in this case imposes upon insureds the duty to assist insurers in the conduct of suits and in enforcing any right to contribution or indemnity against persons potentially liable to insureds."); *Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 358 Ill. App. 3d 880, 882, 885, 295 Ill. Dec. 665, 666, 668, 833 N.E.2d 871, 872, 874 (2004) (distinguishing "notice of occurrence" and "notice of lawsuit" cases because the contract in question gave the insurer "the right and duty to defend any suit" or to "settle any claim or suit") (internal quotation marks

omitted); *American Country Ins. Co. v. Bruhn*, 289 Ill. App. 3d 241, 244, 224 Ill. Dec. 805, 807, 682 N.E.2d 366, 368 (1997) (notice provision required insured to "[c]ooperate with [insurer] in the investigation, settlement or defense of any claim or suit").

To be sure, some cases applying Illinois law have gone beyond contractual texts to find implied remedies for lack of notice in contracts to give full effect to notice provisions. See, e.g., *Kerr v. Illinois Central R.R. Co.*, 283 Ill. App. 3d 574, 581–82, 219 Ill. Dec. 81, 87, 670 N.E.2d 759, 765 (1996) (construing notice provision to include implied remedy where excess insurer did not reserve right to participate in defense of claim, lest insurer "be called on simply to write the check"); see also *AU Electronics, Inc. v. Harleysville Grp., Inc.*, 82 F. Supp. 3d 805, 814 (N.D. Ill. 2015) (explaining rationale of Illinois insurance rules as applied to contracts that "entitle the insurers to control the insured's defense against a covered claim and negotiate a settlement").

The principal-agent problems motivating the unusual, non-textual finding of an implied duty to cooperate in *Kerr* are less relevant here because the underlying alleged contract breaches were not with strangers but with Damian's clients. And apart from policy arguments, the Sellers' contention that the notice requirement implicitly granted the Sellers a right to bargain independently with their former clients is not supported by the text of the sophisticated parties' elaborate Agreement. Nothing in the language of the Agreement required Sterling to involve the Sellers in any settlement negotiations or to allow the Sellers to settle the claims themselves. It would seem odd to give the Sellers the ability to poison the relationship between Damian and its clients.

Odd enough, anyway, not to find an implied right to do so. Any exception that might be gleaned from *Kerr* does not apply here, so any supposed delay in giving notice of the indemnification claim did not cause the Sellers to lose a right secured by the Agreement.

Second, the Sellers also have not irrevocably forfeited the right to litigate the underlying contract claims. They are in fact litigating the merits of those claims in this case. They can still assert contract defenses, and the merits of Sterling's claim hinge on whether the underlying hypothetical contract claims against Damian would have had any merit. That is, even though the temp agency clients are not parties to this litigation, Sterling must still show that Damian was liable to them. The Sellers can litigate these claims now.

The Sellers counter that this reading unduly narrows their rights to litigate the claims. Their theory seems to be that they will have a more difficult time proving damages now that some but not all clients have already been reimbursed. But the parties here are commercially sophisticated. They wrote their Agreement to nullify an indemnification demand for delay only if and to the extent the delay resulted in "irrevocable forfeiture" of a claim or defense. That's a high bar. If they had wanted the Agreement to bar indemnification if late notice merely impeded or weakened a claim or defense, they could have said so. E.g., *Procaccio Painting*, 794 F.3d at 680.

Third, the Sellers have not irrevocably forfeited any investigation rights. The relevant provisions of § 8.05(c) are in some tension on this point:

The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Company's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request.

The Sellers claim that this language gave them a right to participate in Sterling's internal, pre-claim investigation, which they say was irrevocably lost when Sterling investigated on its own. The Sellers also contend that they have lost the right to conduct their own timely investigation because (a) information about the settlement value of the underlying claims is now unobtainable, (b) any subsequent investigation would be rendered a nullity because Sterling paid the clients already, and (c) Sterling unfairly blocked third-party discovery in this case.

The Sellers' arguments assert rights not granted by the Agreement. Section 8.05(c) of the Agreement is ambiguous in important respects, but it quite plainly assumes that Sterling would need to conduct some investigation of its own *before* giving notice of a Direct Claim for indemnification. The Agreement required Sterling, in giving formal notice, to "describe the Direct Claim in reasonable detail, [] include copies

of all material written evidence thereof and [] indicate the estimated amount … of the Loss." § 8.05(c). Sterling could not have met that requirement without a substantial pre-demand investigation.

The Sellers' asserted right to investigate must be consistent with these requirements. Nothing in the Agreement granted the Sellers a right to conduct a contemporaneous investigation even before Sterling gave notice of its demand. Perhaps, as the Sellers suggest, it was unreasonable for Sterling to run up $650,000 in investigation costs. If so, that issue would affect only whether the professional fees were indemnifiable "Losses," not whether one can find an implied (and illogical) right for an indemnifying party to conduct its own investigation even before a demand is made.

The Agreement refers to the "Indemnifying Party's investigation," not to the "Indemnifying Party's participation in the Indemnified Party's investigation," which would make little sense. After demand is made, according to the Agreement, the Sellers had a limited right of access to documents and personnel. The Sellers had that right whether the notice was late or timely, but they did not have a right to do more earlier.

The Sellers also complain about being denied the right to depose certain clients of Damian under the Federal Rules of Civil Procedure in this action. The Sellers' argument on this point is difficult to follow. Nothing in the Agreement itself provides—or could provide—the right to subpoena third parties through the parties' private dispute-resolution procedures. The Federal Rules of Civil Procedure apply in this case, of course, but on appeal, the Sellers have not challenged any case-management limits on depositions. On remand, the dis-

trict court may of course choose to revisit the scope of discovery, but nothing about this dispute relieves the Sellers of any otherwise valid claim for indemnification.

The Sellers' original response to the indemnification demand underscores that any right to investigate is far more limited than they argue now. As noted, the Sellers objected to Sterling's thirty-page demand for indemnification on the ground that it did not provide enough detail. That is, the Sellers claimed the demand was insufficient under the Agreement unless and until Sterling provided the kinds of documentation that could have come only from an investigation that would have been even more thorough than the one that the Sellers now argue took too long and was too expensive.

Along those lines, the Sellers also argue that the right to investigate was lost because Sterling prematurely settled any outstanding claims by customers. We reject this attempt to recast the first two arguments within the framework of the investigation for the reasons above. The Agreement simply did not grant the Sellers a right to negotiate with third parties in addressing a Direct Claim like this. And even if the Sellers lost the ability to learn exactly what each current client might have accepted as a settlement offer for purposes of computing damages in this lawsuit, they have not lost access to Damian's former clients, who have not yet been paid. The Sellers have not irrevocably lost any opportunity to investigate the amounts for which temp agencies would settle.[2]

_____

[2] We need not resolve Sterling's back-up argument that disputed facts about the extent to which the Sellers were harmed require remand for trial. Section 8.05(c) relieves the Sellers of a duty to indemnify only "to the extent that the Indemnifying Party irrevocably forfeits rights or defenses." Our conclusion that the extent of irrevocable harm was zero resolves this

V. *Directing Summary Judgment on Other Grounds?*

Looking beyond the notice issues, both sides also contend that they should prevail as a matter of law on issues the district court did not address. Their arguments focus on the merits of the underlying contract disputes that Damian's clients might have raised based on the 2009 change in dating invoices.

We are not convinced that either side should prevail as a matter of law on the merits of those hypothetical claims for breach of contract. To highlight just two of our concerns, the underlying client contracts did not include specific language on how invoices should be dated. That silence may make it impossible to decide with one stroke whether the 2009 change did or did not breach all of those contracts. The evidence of the Sellers' misleading script for calming any restless clients supports an inference that the Sellers knew the 2009 change was not authorized and could lead to unhappy clients and even litigation. On the other hand, the fact that no clients ever sued and that most apparently never noticed the 2009 change supports an inference that it was not a significant concern to them.[3]

---

issue. In any event, the district court's grant of judgment as a matter of law would have been erroneous even if the Sellers had demonstrated *some* irrevocable harm because they did not show that, taking all the evidence in the light most favorable to Sterling, the Sellers had forfeited their entire case, that is, that the extent of forfeiture was complete.

[3] The Sellers' brief argues that the client contracts required Damian to "render" the invoices promptly at the end of the workweek and that these provisions implicitly also required *dating* the invoices as of the end of the workweek. But at oral argument, the Sellers conceded that they did not

To the extent that either side relies on a course of dealing or other evidence beyond the inconclusive text of the client contracts themselves, it may be impossible to decide the merits of those hypothetical claims without a close look at Damian's dealings with each client. That course would be a poor candidate for summary judgment, let alone an appellate decision in the first instance. See *International Financial Servs. Corp. v. Chromas Technologies Canada, Inc.*, 356 F.3d 731, 740 (7th Cir. 2004) (refusing to direct summary judgment on issue that "depends on a host of considerations that this court is ill-positioned to weigh as a matter of first impression").

## VI. *Pre-judgment Interest Under the Agreement*

The district court held that the Sellers were entitled to the two million dollars in escrow but were not entitled to pre-judgment interest on the funds. *Sterling II*, 2019 WL 5085715, at *6. We must set aside the ruling that the Sellers are entitled to the escrow funds, but the issue of pre-judgment interest is likely to arise on remand. Those funds will eventually need to be distributed to someone. We agree with the district court that, under the terms of the parties' Agreement, pre-judgment interest is not available.

As a general matter, in a contract dispute like this one, pre-judgment interest may be awarded under state law as a matter of statute or contract. See *Procaccio Painting*, 794 F.3d at 680 (turning to state law); *Kouzoukas v. Retirement Board of Policemen's Annuity & Benefit Fund of City of Chicago*, 234 Ill. 2d 446,

---

"render" the invoices until *after* the invoice date. Because the client contracts did not speak to dating and the only arguably relevant contract language is inapposite, we cannot decide this case based on only the "render" language.

474, 334 Ill. Dec. 924, 940, 917 N.E.2d 999, 1015 (2009) ("As a general rule, prejudgment interest is recoverable only where authorized by the agreement of the parties or by statute.").

The Sellers argue they were entitled to pre-judgment interest under the Illinois Interest Act, 815 ILCS 205/2, which authorizes interest awards for "all moneys after they become due on any bond, bill, promissory note, or other instrument of writing" and "money withheld by an unreasonable and vexatious delay of payment." Sterling counters that the Agreement expressly waived prejudgment interest outside of the indemnification framework and that the Sellers failed to comply with the indemnification procedures in seeking interest.

Several Agreement provisions are relevant. First, Section I identifies "interest" as a form of "Losses." The Agreement also has an expansive "Exclusive Remedies" provision in which "the parties acknowledge and agree that their *sole and exclusive remedy with respect to any and all claims* (other than claims arising from … intentional misconduct …) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement shall be pursuant to the indemnification provisions . . . ." § 8.09 (emphasis added). Likewise, "each party [] waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto … except pursuant to the indemnification provisions." *Id.*

Section 8.03 explains when the Sellers may seek indemnification: for "any and all Losses incurred or sustained by, or imposed upon the Seller Indemnitees based upon, arising out of, with respect to or by reason of[] … any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement."

The Agreement required that two million dollars be deposited into the escrow account at closing, with one million to be released to the Sellers on December 31, 2015, and the rest to be released eighteen months after closing, in August 2016. § 2.02(b). These funds, however, were not to be released "in the event one or more claims have been asserted by Buyer against Seller" pursuant to the indemnity provisions. *Id.* In that case, Sterling was to "reasonably estimate the amount of Losses that could reasonably be incurred by [Sterling] if such Asserted Claims were successful (the 'Reserve')." *Id.* In the event Sterling makes a claim, the Reserve may not be released. The parties also signed a separate Escrow Agreement, which included provisions allowing the parties to agree to move the escrow funds to alternate interest-bearing investment accounts. See generally Dkt. 20-2. The Agreement also included a custom-tailored provision for *post*-judgment interest, calling for interest to accrue at 12%, but not starting until five business days after an agreement to pay or a "final, non-appealable adjudication." § 8.06(a).

The Sellers have not shown that they complied with the indemnification procedures described above to demand interest. They became aware of Sterling's Direct Claim on December 11, 2015 and responded by the end of that month, yet it is not clear that they ever provided proper notice of a claim for

interest. The parties had plenty of opportunities to put the escrowed funds in an interest-bearing account, yet they never did so.

Apart from the Sellers' ironic failure to follow the same indemnification notice procedures that they insist Sterling failed to follow, neither the Agreement nor the Illinois Interest Act provides for pre-judgment interest here. The Agreement acknowledges that interest may be available as a Loss, but it funnels all claims through the indemnification provisions. Those terms allow the Sellers to recoup Losses only for *breaches* of the Agreement. Here, the Agreement did not require the release of funds that "could be reasonably incurred by [Sterling] if such Asserted Claims were successful." Importantly, "reasonably" modifies the dollar value of the claims if successful, not the probability of victory on any claims.

Sterling's demand for the entire two million dollars may or may not succeed in the end, but it was not unreasonable as a matter of law for Sterling to make the demand. A forensic accounting firm estimated that Damian overcharged its clients by almost $1.3 million, and Wachtell Lipton and the forensic accountant billed hundreds of thousands of dollars. The costs of enforcing the indemnification provision were also uncertain. If Sterling did not breach the Agreement by demanding indemnification, the Agreement bars pre-judgment interest.

To avoid this logic, the Sellers cite *Katzman v. Helen of Troy Texas Corp.*, 2013 WL 1496952 (S.D.N.Y. Apr. 11, 2013), in which a district court held that a similarly broad waiver of non-indemnification remedies did not foreclose statutory in-

terest. The court reasoned that the contract did not "ever anticipate[] a controversy of this nature" (restraint of funds in an escrow account) so that the contract could not have waived pre-judgment interest. *Id*. at *5.

We do not disagree with *Katzman*, but that case differs from this one in decisive ways. First, this contract is subject to Illinois law, which uses only a presumption of pre-judgment interest in some cases, while *Katzman* applied New York law, which generally *requires* prejudgment interest. Compare, e.g., *Santa's Best Craft, LLC v. Zurich American Ins. Co.*, 408 Ill. App. 3d 173, 191, 346 Ill. Dec. 733, 941 N.E.2d 291, 307–08 (2010) (trial court's decision to award pretrial interest is discretionary and subject to prudential concerns), and *Kouzoukas*, 234 Ill. 2d at 476, 234 Ill. Dec. at 942, 917 N.E.2d at 1017 ("Statutes permitting the recovery of interest … must be strictly construed."), with *Katzman*, 2013 WL 1496952, at *2 ("A long line of case law has held that prejudgment interest is mandatory.") (collecting cases applying New York law).

Second, although the waiver provisions in the Agreement here and the *Katzman* contract are similar, the overall contracts are not. The Agreement here expressly contemplated that funds could be held in escrow past eighteen months if Sterling brought a Direct Claim. That's exactly what happened. Nothing in the Agreement suggests that holding funds in escrow because of an ongoing dispute would breach the Agreement. That's the point of the escrow fund. Thus, unlike in *Katzman*, the parties here *did* "anticipate a controversy of this nature" and excluded it from the definition of indemnifiable Losses.

The Sellers further argue that the Exclusive Remedies provision does not apply here because Sterling's request for indemnification qualified as "intentional misconduct" in three

ways. None is convincing. First, they claim that it was misconduct for Sterling to seek indemnification for funds it has not yet paid to former clients. But indemnifiable "Losses" includes "liabilities," an ambiguous word that can refer to a case such as this, where "society is not yet commanding performance, but it will so command if the possessor of the power does some operative act." Black's Law Dictionary (11th ed. 2019), quoting William R. Anson, Principles of the Law of Contract 9 (Arthur L. Corbin ed., 3d Am. Ed. 1919). The Sellers' reading of this provision would also present Sterling with a Catch-22: the Sellers say both that demanding indemnification for as-yet unpaid funds is intentional misconduct, but also that paying refunds before an indemnification demand was a breach that caused the Sellers irrevocable harm.

Second, the Sellers claim that Sterling committed intentional misconduct in seeking attorneys' fees. The definition of Losses in Section 1 is internally contradictory. It both includes and excludes attorneys' fees: "Losses means all … out of pocket third party costs or expenses of whatever kind, including reasonable attorneys' fees … provided, however, that 'Losses' shall not include … attorneys' fees and expenses." Regardless of how this issue might ultimately be resolved, we cannot see how arguing one side of this "classically ambiguous" contradiction could be intentional misconduct. See *Universal Guaranty Life Ins. Co. v. Coughlin*, 481 F.3d 458, 464 (7th Cir. 2007).

Third, the Sellers claim that even if hypothetical future payments and attorneys' fees are included, Sterling's itemized Losses did not add up to two million dollars, so that it was misconduct to ask for more than Sterling would be entitled to.

But Losses also include "the cost of enforcing any right to indemnification," which the parties have now been litigating for four years.[4]

Even if the Agreement did not waive claims to pre-judgment interest, it is not clear that the Illinois Interest Act would apply. The Act allows for pre-judgment interest for "money due on a" document or "vexatious refusal to pay." Money was not due on the Agreement because it expressly granted Sterling the right to reserve escrow funds. Although the district court did not directly address the "vexatious" prong, it rightly noted that a "faulty reading" of the Agreement differs from willful misconduct. *Sterling II*, 2019 WL 5085715, at *6. Regardless of who prevails at the end of this lawsuit, it is hard to see on this record how the district court's refusal to award pre-judgment interest here could be an abuse of discretion. See *Twenhafel v. State Auto Prop. & Casualty Ins. Co.*, 581 F.3d 625, 630–31 (7th Cir. 2009).

The conclusion that pre-judgment interest is unavailable here is bolstered by the fact that the Agreement explicitly requires post-judgment interest in certain circumstances. The parties' choice to write around the indemnification requirements for one specific exception further underscores that they did not intend to do so for all cases. See *Rickher*, 535 F.3d at 668 (explaining that Illinois courts use *expressio unius* canon as an interpretive tool).

Finally, we address two remaining issues that may resurface on remand: the district court's refusal to award post-

---

[4] We decide here that *requesting* attorneys' fees as Losses did not amount to intentional misconduct, but we do not decide here whether attorneys' fees are in fact Losses.

judgment interest at the higher contractual rate and its award of certain costs for duplicating electronically stored information.

A federal statute calls for post-judgment interest on money judgments at a formula tied to the market for one-year Treasury bills. 28 U.S.C. § 1961. The Sellers want to collect 12% post-judgment interest based on a provision in the Agreement imposing that higher rate where the indemnifying party fails to make full payment within five business days of a "final, non-appealable adjudication." See § 8.06(a). The district court correctly observed that the Agreement's 12% interest rate does not apply until after a judgment becomes final and non-appealable. Again, that's what the parties bargained for, and that's the rule that applies.

Regarding costs, the circuits disagree under 28 U.S.C. § 1920(4) about the outer boundary of reimbursable copying costs for electronically stored information. See *Colosi v. Jones Lang LaSalle Americas, Inc.*, 781 F.3d 293, 297–98 (6th Cir. 2015), discussing *CBT Flint Partners, LLC v. Return Path, Inc.*, 737 F.3d 1320 (Fed. Cir. 2013), and *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158 (3d Cir. 2012); see also *United States ex rel. Long v. GSDMIdea City, LLC*, 807 F.3d 125, 131–32 (5th Cir. 2015) ("Courts have not uniformly addressed which electronic discovery costs are recoverable under the most recent version of § 1920(4)."); but see *Hecker v. Deere & Co.*, 556 F.3d 575, 591 (7th Cir. 2009) (concluding without elaboration that "the costs [] for converting computer data into a readable format … are recoverable under 28 U.S.C. § 1920"). If the parties wish to press this issue on remand, they may want to pay close attention to these differences. Some of the requested copying costs here may lie beyond the outer limits of some or

all of the circuits' tests. Compare *Race Tires*, 674 F.3d at 167, citing *Hecker*, 556 F.3d at 591 (excluding from taxable costs "collecting and preserving ESI; processing and indexing ESI; [and] keyword searching of ESI for responsive and privileged documents"), with Dkt. 176 at *59 (requesting costs for quality control and communicating with Sellers); *63 (requesting costs for time spent verifying password).

The judgment in favor of the Sellers is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.